**FRIENDS OF THE EARTH et al.,**
**Plaintiffs-Appellants,**

v.

**Hugh CAREY et al.,**
**Defendants-Appellees.**

**No. 557, Docket 75–7497.**

United States Court of Appeals,
Second Circuit.

Argued March 1, 1976.
Decided April 26, 1976.

**168**

David Schoenbrod, New York City (Ross Sandler, Natural Resources Defense Council, Inc., New York City, of counsel), for plaintiffs-appellants.

Alexander Gigante, Jr., New York City (W. Bernard Richland, Corp. Counsel, Nina G. Goldstein, New York City, Atty., Isaac Klepfish, New York City, of counsel), for defendants-appellees Beame, Codd, Eisenpreis, Kove, Guggenheimer, Low, Lazar, Zuccotti, Tarshis, O'Dwyer, Karagheuzoff and The City of New York.

James P. McMahon, Brooklyn, N. Y. (Stuart Riedel, Brooklyn, N. Y., Nancy A. Serventi, New York City, Atty., Terrance J. Nolan, Brooklyn, N. Y., of counsel), for defendant-appellee New York City Transit Authority.

Before MANSFIELD, TIMBERS and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal arises out of the efforts of a group of the country's leading environmental and citizens' groups to enjoin and roll back the increase in New York City transit fares from 50 cents to 35 cents per ride and to enforce the "clean air" provisions of the Transportation Control Plan for the Metropolitan New York City Area ("the Plan"), which have long been approved pursuant to the Clean Air Act Amendments of 1970, 42 U.S.C. §§ 1857, et seq. ("the Act"). Defendants include the State and City of New York and named officials of both governmental entities as well as officials of the New York City Transit Authority [1] ("TA"). The dispute raises important questions concerning the viability of the citizen suit provision of the Act, § 304, 42 U.S.C. § 1857h–2, and the enforceability of the air quality standards enacted by Congress under that statute.

### THE STATUTE

To understand the issues a brief preliminary outline of the relevant statutory provisions governing the state's obligation to clean up the air of Metropolitan New York City is necessary.[2] Expressing dissatisfaction with earlier efforts at air pollution abatement,[3] Congress enlarged the federal government's role through enactment of the Clean Air Act Amendments of 1970, 42 U.S.C. §§ 1857, et seq. The United States Environmental Protection Agency ("EPA") was instructed to establish national air quality standards of two types: (1) "primary ambient" (outdoor surrounding air) standards necessary for protection of the public health, § 109(b)(1), 42 U.S.C.

---

**1.** Neither the State nor State government officials appeared before this court or the district court to answer plaintiffs' challenges. Attorneys for the New York City Transit Authority and for the City government appeared and filed briefs.

**2.** For further discussion of the history and operation of the statute, see the descriptions by the Supreme Court in *Train v. N. R. D. C.*, 421 U.S. 60, 63–67, 95 S.Ct. 1470, 1474–1476, 43 L.Ed.2d 731, 736–739 (1975), and by this court

in *Friends of the Earth v. E.P.A.*, 499 F.2d 1118, 1120–23 (2d Cir. 1974). See also Luneberg, *Federal-State Interaction Under the Clean Air Amendments of 1970*, 14 B.C.Ind. & Com.L. Rev. 637 (1973).

**3.** See, e. g., Pub.L. 86–493, 74 Stat. 162 (1960); Clean Air Act of 1963, 77 Stat. 392; 79 Stat. 992 (1965 amendments); 80 Stat. 954 (1966 amendments); Air Quality Act of 1967, 81 Stat. 485.

§ 1857c–4(b)(1), and (2) "secondary ambient" standards "requisite to protect the public welfare from any known or anticipated adverse effects associated with" air pollution, § 109(b)(2). Each of the 50 states was obligated within nine months thereafter to submit to the EPA an implementing plan for achievement of these standards, § 110(a)(1), 42 U.S.C. § 1857c–5(a)(1). In particular, the states' plans were to satisfy the primary, health-related standards "as expeditiously as practicable" but in no case later than three years from the date of EPA approval, § 110(a)(2)(A)(i), and the secondary standards within a "reasonable time" to be fixed by a timetable, § 110(a)(2)(A)(ii). According to the approved timetable, state plans were to be filed by April 1973 and the primary air quality standards met by May 31, 1975. See *Natural Resources Defense Council, Inc. v. E.P.A.*, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973). Should a state plan prove unsatisfactory in satisfying the ambient standards, the EPA itself is directed by Congress to develop an appropriate implementing plan in its stead, § 110(c)(1).

Since abatement and control of air pollution through systematic and timely attainment of the air quality standards is Congress' overriding objective, a plan, once adopted by a state and approved by the EPA, becomes controlling and must be carried out by the state. Modifications are permitted by the Act only cautiously and grudgingly. The EPA is authorized to approve *revisions* of the original plan, § 110(a)(3), only if it is satisfied that the revised plan still meets the requirements of the national air quality standards, § 110(a)(2). In addition, a state may request *postponement* of plan implementation

"for not more than one year,"[4] § 110(f), provided it "can satisfy the stringent conditions" imposed by that provision,[5] *Train v. N.R.D.C.*, 421 U.S. 60, 90, 95 S.Ct. 1470, 1487, 43 L.Ed.2d 731, 752 (1975). In all other cases full compliance with the plan is mandated. See *id.* at 89–90, 95 S.Ct. at 1486–1487, 43 L.Ed.2d at 751–752.

## FACTS

The history of New York State's steps toward compliance with the Clean Air Act through July 1974 is detailed in our prior opinion. See *Friends of the Earth v. E.P.A.*, 499 F.2d 1118 (2d Cir. 1974). It is sufficient for present purposes to note that the State submitted to the EPA a plan called the Transportation Control Plan for the Metropolitan New York City Area ("the Plan"), containing 32 mandatory "strategies" or schedules of specific actions to be taken by certain dates to abate air pollution. The strategies were designed to meet the 1975 primary air quality deadline, to maintain air quality beyond that date, to create contingency steps or procedures should the primary strategies fail, and to plan for attainment of the secondary ambient air quality standards. The Plan was approved by the EPA on June 22, 1973, with certain revisions.

In 1974 environmental and citizens' groups attacked the Plan by way of a petition for review, *Friends of the Earth v. E. P. A., supra,* arguing that several of the strategies were vaguely worded and inadequate in light of the air pollution standards mandated by the Act. Officials from the federal and state governments defended the strategies. We upheld the Plan in most respects, returning a few provisions to the EPA for further explanation. *Friends of*

---

**4.** The Supreme Court has left open the question of whether successive postponements are permissible, noting that such a step appears in tension with the final bill that emerged from Conference, which deleted explicit language found in a predecessor Senate bill authorizing repeated postponements. *Train v. N.R.D.C., supra,* 421 U.S. at 85–86 n.21, 95 S.Ct. 1470, 1484, 43 L.Ed.2d 731, 749.

**5.** These conditions, listed in the conjunctive in the statute, include a history of good-faith efforts to comply with the Plan, the unavailability of requisite technology, alternative procedures that mitigate the damage to public health, and the importance to "national security or to the public health or welfare" of the continued operation of the pollution source. § 110(f)(1)(A)–(D).

*the Earth v. E.P.A., supra.* Consequently, with the acceptance by the EPA and judicial ratification by this court, the Plan became binding upon and enforceable against state and local officials, subject only to the narrow revision and postponement provisions allowed by the Act.

Nevertheless, enforcement of the Plan's strategies suffered because of inaction on the part of those legally obligated to put it into effect. In 1974, at the original argument before this court, the State had already fallen behind in compliance and consequently both the EPA and citizen groups requested that the court order immediate enforcement of the Plan's strategies. The court, however, was unable at that time, because of lack of jurisdiction, to order compliance, 499 F.2d at 1128, in the absence of a suit to enforce the Plan. The Act expressly provides only two methods for securing enforcement: a suit initiated by the EPA, § 113, 42 U.S.C. § 1857c–8, or a citizen suit pursuant to § 304, 42 U.S.C. § 1857h–2, which authorizes citizens, as private attorneys general, to enforce state implementation plans provided (a) the citizen gives 60 days' notice of a violation to the EPA, the state and the alleged violator, and (b) the EPA or state has failed within the 60-day period to secure compliance or to bring an action for enforcement. Section 304(a)(1) provides that upon meeting these requirements

"[a]ny person may commence a civil action on his own behalf—

"(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ."

Pursuant to this authority the present citizen action was commenced.

On August 5, 1974, plaintiffs served their citizen suit notice of violation, § 304(b)(1)(A), and, after the required 60-day notice period had expired without compliance by the State and without the initiation of enforcement proceedings by the EPA, plaintiffs on October 11, 1974, commenced their action in the Southern District of New York and applied for preliminary relief. The City sought to avoid injunctive relief on the ground that the Plan was in the process of being formally revised. The State's Assistant Attorney General, on the other hand, adopted a somewhat ambivalent position. See *Friends of the Earth v. Wilson,* 389 F.Supp. 1394, 1395–96 (S.D.N.Y. 1974). He admitted "that he had a great deal of difficulty with his clients' arguments." He also acknowledged that the Plan "is a legally enforceable plan, is a legally adequate plan and that the state is committed . . . to fulfilling its responsibilities thereunder." However, he then informed the court that the "State apparently has no intention of implementing certain strategies," while admitting that "[i]f there is a valid legal ground for such a refusal, we have not been able to find it, your honor." In addition, he disputed the legal contention of both the city officials and the State Department of Environmental Conservation "that the proposed revision precluded enforcement of the plan," by noting that the revision was "speculative at best" and that the Governor-elect had opposed any such revision. Events a mere four days later proved the speaker correct concerning the uncertain nature of the "pending" revision.

The district court, Kevin T. Duffy, *Judge,* recognized that the State and City in effect conceded that they were in noncompliance with the Plan. However, on December 16, 1974, Judge Duffy denied relief, stating that in light of the proposed revision he would await clarification of the EPA's position and that the court lacked the expertise to supervise enforcement, which would involve "highly technical" problems. 389 F.Supp. at 1396.

Four days later the EPA ruled that the State had failed to complete its application

for a revision and on January 8, 1975, issued notices of violation with respect to 12 of the 32 strategies contained in the Plan, § 113(a)(1), 42 U.S.C. § 1857c–8(a)(1). The EPA, however, refused to initiate judicial enforcement proceedings as authorized by § 113 of the Act and instead attempted to negotiate consensual administrative orders.[6] By July, 1975, three months after the March 31 deadline for satisfaction of the primary ambient standards had expired, the City and State remained in explicit violation of four of the most important strategies [7] and had consented to eight other strategies.[8] Administrative action apparently had not even been commenced to enforce the remaining twenty. As of that date, although the Plan was designed to reduce carbon monoxide pollution by 78%, carbon monoxide levels in the City (95% of which are attributable to motor vehicles) had actually increased since pre-Plan days by some 25% and were now five times the level set by federal health standards. Thus these violations were significantly harmful to public health.

In late July the Transit Authority announced a pending transit fare increase from 35 cents to 50 cents. Believing that such an increase would undermine implementation of the Plan, plaintiffs returned to the district court on July 28, 1975, and, through an order to show cause, sought a preliminary injunction restraining the fare increase and ordering Plan enforcement.

On August 4, 1975, plaintiffs moved for partial summary judgment enforcing four strategies that indisputably were being violated and that were cited as violations by the EPA. See note 7 *supra*. In addition, plaintiffs again requested the enforcement of the entire Plan.

On August 28, 1975, the district court again denied plaintiffs' request for relief on several grounds.[9] In refusing to enjoin the fare increase Judge Duffy noted that the original complaint and statutory notice required by § 304(b)(1) had failed to name the Transit Authority ("TA"), the agency to which responsibility for the fare increase had been delegated. Therefore, although notice was given to its sister agency, the Metropolitan Transportation Authority, and to the state authorities officially responsible for compliance with the Plan, and although TA officials had notice in fact, the district court dismissed the complaint as to the TA for violating "[s]tandards of fairness and due process." In addition, the court found that there was a "substantial question" as to whether the court had subject matter jurisdiction over the fare increase since the terms of the Plan did not prohibit such an increase.

The district court also refused enforcement of the Plan. Even though the defendants had not denied plaintiffs' allegations that they were in outright violation of at least four important strategies and were in various stages of noncompliance with the

**6.** The Administrator of the EPA is authorized, upon finding that an implementation plan is being violated, to issue orders directing the person in violation of the Plan to comply. However, if that person violates the order the Administrator's only recourse is to commence a civil action in the district court for appropriate relief. See § 113(a)(1), (4) & (b), 42 U.S.C. § 1857c–8(a)(1), (4) & (b). Any person who knowingly violates an implementation plan's requirements or an order issued by the Administrator is guilty of a misdemeanor punishable by a fine of not more than $25,000 per day of violation or by imprisonment for not more than one year, or both, § 113(c)(1).

**7.** These strategies are: reductions in business district parking, selective ban on taxicab cruising, tolls on the East and Harlem River bridges, and night-time freight movement. The last two

of these strategies were added to the primary strategies by Governor Rockefeller on April 17, 1973, in a letter to the EPA in which the Governor requested, and subsequently received, extensions of time to meet the photochemical oxidants standard and carbon monoxide standards of the original plan.

**8.** Emission inspections of cars, trucks, and taxicabs, mechanic training, enforcing existing traffic regulations, traffic management, increased express bus services, and retrofit of trucks. Even here, however, the plaintiffs allege that City and State officials have failed to comply with the administrative order. The EPA recently has filed separate suit to enforce the taxicab-inspection strategy.

**9.** 74 Civ. 4500. The order and opinion are not officially reported.

remaining twenty-eight,[10] the district court, apparently proceeding on the basis of unsupported assumptions derived from "a plethora of paper emanating from the parties," concluded that "there exist many true issues of fact . . . ."[11] The court also apparently relied upon the fact that several orders were "presently under negotiation" between the EPA and the State. However, the court neither defined these "issues of fact" nor explained the reasons for its unwillingness to enforce those strategies as to which the defendants were clearly in default other than to state that enforcement would necessitate excessive supervision by the district court "where there is already a federal agency charged with the enforcement of the Plan." Accordingly, he ordered that the action be dismissed unless plaintiffs joined the EPA as a party within 10 days. On the following day, August 29, 1975, plaintiffs filed their notice of appeal from the district court's order.

## DISCUSSION

Since the district court appears to have labored under some fundamental misconceptions regarding not only the purpose of the citizen suit provisions of the Clean Air Act but also the roles of the parties and the court's own duty in such a suit, some clarification of these matters is essential at the outset.

█ In enacting § 304 of the 1970 Amendments, Congress made clear that citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests. Fearing that administrative enforcement might falter or stall, "the citizen suits provision reflected a deliberate choice by Congress to widen citizen access to the courts, as a supplemental and effective assurance that the Act would be implemented and enforced." *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692, 700 (1975). The Senate Committee responsible for fashioning the citizen suit provision[12] emphasized the positive role reserved for interested citizens:

"Government initiative in seeking enforcement under the Clean Air Act has been restrained. Authorizing citizens to bring suits for violations of standards should motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings."

Senate Committee on Public Works, S.Rep. No.91–1196, 91st Cong., 2d Sess., at 35–36 (1970). See also Committee of Conference, H.R.Rep.No.91–1783, 91st Cong., 2d Sess. (1970) U.S.Code Cong. & Admin.News 1970, p. 5356, reprinted in U.S.E.P.A., Legal Compilation (Air), Vol. III, at 1386–87 (1973). And the Congress apparently was sufficiently pleased with the operation of the citizen suit section of the Clean Air Act to essentially duplicate the provision in the subsequently enacted Water Pollution Control Act of 1972, § 505, 33 U.S.C. § 1365.

█ Thus the Act seeks to encourage citizen participation rather than to treat it as curiosity or a theoretical remedy. Possible jurisdictional barriers to citizens actions, such as amount in controversy and standing

---

**10.** Indeed, at oral argument before this court the City's attorney also acknowledged widespread noncompliance with the air quality plan, although he disliked that choice of words and preferred to state that the City "had fallen behind" the mandated timetable. The State, although primarily responsible for Plan compliance, has remained silent on this appeal.

**11.** Judge Duffy, referring to the eight strategies with respect to which formal administrative consent orders had been negotiated between the State and the EPA, see note 8 *supra,* noted that plaintiffs alleged that even these orders had not been complied with and proceeded to surmise that "[i]t must be assumed that defendants would disagree with this allegation." From this he apparently concluded that, since "it must be assumed" that at least these eight of the 32 strategies remain in dispute, relief is properly denied as to all of the Plan's provisions.

**12.** The House bill contained no provision for citizen suits. The Senate version prevailed in Conference Committee. See Committee of Conference, H.R.Rep.No.91–1783, 91st Cong., 2d Sess. (1970), reprinted in U.S.E.P.A., Legal Compilation (Air), Vol. III, at 1386 (1973).

requirements, are expressly discarded by the Act. As additional encouragement the Act expressly authorizes courts to award costs of litigation to any party when "appropriate," § 304(d); see *Natural Resources Defense Council, Inc. v. E.P.A.,* 168 U.S. App.D.C. 111, 512 F.2d 1351, 1357 (1975); *Natural Resources Defense Council, Inc. v. E.P.A.,* 484 F.2d 1331 (1st Cir. 1973).

"The courts should recognize that in bringing legitimate actions under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party. This should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." Senate Committee on Public Works, *supra,* at 37.

■ Once a citizen suit to enforce an EPA-approved state implementation plan has been properly commenced, the district court is obligated, upon a showing that the state has violated the plan, to issue appropriate orders for its enforcement. The court may not, over the plaintiff's objection, escape this obligation on the ground that the EPA is attempting to negotiate consent orders or has not been joined as a party in the citizen suit. Indeed, since it is EPA's failure to obtain compliance and to seek enforcement that brings the citizen suit into play, it would defeat the very purpose of that enforcement mechanism to require that the EPA be dragged reluctantly into the enforcement proceedings. The statute simply obligates the citizen plaintiff to provide the EPA with notice of the Plan's violation and of the upcoming private enforcement suit, § 304(b)(1)(A). The agency can then decide for itself whether or not to participate in the proceedings. "[T]he Ad-

ministrator has the right to intervene in the suit, but he is not required to be a participant in such litigation and his absence does not render the action infirm." *Metropolitan Washington Coalition for Clean Air v. District of Columbia,* 167 U.S.App.D.C. 243, 511 F.2d 809, 814–15 (1975).

Of course the EPA's participation in a citizen enforcement suit is welcomed by the court, since the EPA, as the agency vested by Congress with important overall responsibilities related to the matter under consideration, possesses expertise which should enable it to make a major contribution. But both the underlying rationale and legislative history surrounding the citizen suit provision demonstrate that Congress intended the district court to enforce the mandated air quality plan irrespective of the failings of agency participation. As noted earlier, the very purpose of the citizens' liberal right of action is to stir slumbering agencies and to circumvent bureaucratic inaction that interferes with the scheduled satisfaction of the federal air quality goals.

■ Nor may the district court deny citizen enforcement of an approved state implementation plan on the ground that the task of supervising enforcement would be unduly burdensome or require the court to grapple with "highly technical" problems. Whatever may be the wisdom of having added this chore to the others imposed by new legislation upon the federal judiciary, Congress' intention that the courts must accept the duty is clear and unmistakable. Realizing that the responsibility for enforcement would thus fall upon the courts, Congress nevertheless viewed a plan's strategies as containing sufficiently clear and specific guidelines to enable a federal judge to direct compliance, armed as he is with the power to obtain such expert advice and assistance as may be necessary to guide him.[13]

---

13. As the substantial flow of affidavits submitted on behalf of the parties demonstrates, the district court operating in an adversarial setting can expect to derive considerable technical assistance and clarification from experts provided by the parties themselves. In addition, opportunities are open for the court to arrange for neutral technical advisors and experts to assist him in the performance of his duties. See generally Leventhal, *Environmen-*

"Enforcement of pollution regulations is not a technical matter beyond the competence of the courts. The citizen suit provision is consistent with principles underlying the Clean Air Act, that is the development of identifiable standards of air quality and control measures to implement such standards. Such standards provide manageable and precise benchmarks for enforcement." Senate Committee on Public Works, *supra,* at 37. Indeed federal courts are daily called upon to resolve complex and difficult questions in many diversified fields such as antitrust, patent, and admiralty. Furthermore, in adopting § 304, Congress specifically considered but rejected arguments advocating the deletion or weakening of the citizen suit section of the Act on the ground that enforcement difficulties would overburden the courts.[14]

With these principles in mind we turn to the issues which are the immediate subject of this appeal: whether the district court erred in (1) refusing to enjoin the transit fare increase, and (2) refusing to enforce those strategies of the Plan which admittedly are being violated and to take steps toward enforcement of the other provisions of the Plan. With respect to the first of these two matters—the fare increase—we hold that the district court did not abuse its discretion in denying preliminary relief. As for the enforcement of the Plan's strategies, we direct the district court immediately to issue such orders as are necessary to enforce those strategies admittedly being violated and to conduct an expeditious hearing to determine the remaining violations and to enforce the other strategies as required by the Plan.

*tal Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 546–49 (1974).

14. For the arguments opposing § 304 on this basis, see Cong.Rec. Vol. 116 (Sept. 21–22, 1970), at 32,925–26 (Senator Hruska); *id.* at 33,102 (Senator Griffin). For the major responses, see *id.* at 32,926–27 (Senator Muskie); *id.* at 33,104 (Senator Hart).

## THE TRANSIT FARE INCREASE

### Notice

■ The district court's primary basis for refusing to enjoin the transit fare increase was its finding that the notice given by the plaintiffs to the TA, the governmental agency to which responsibility for the transit fare schedules is delegated by the state, was inadequate. We disagree and find that the notice was clearly sufficient.

On August 5, 1974, as prescribed by the Clean Air Act, § 304(b)(1)(A), 42 U.S.C. § 1857h–2(b)(1),[15] plaintiffs sent their citizen suit notice of violations, including a comprehensive 34-page Table of Violations, to the Governor of New York State, the EPA, and the New York State Department of Environmental Conservation. While claiming that this notice met the requirements of the Act, plaintiffs additionally sent individual notice to each of 15 agents and agencies of the State to whom the State had delegated some responsibility for Plan compliance. In this latter group were officials of New York City and officers of the Metropolitan Transportation Authority ("MTA"), the TA's sister agency, including their joint chairman, David L. Yunich. Although the MTA and the TA technically are separate corporate entities under state law, they have the same chief executive, the same Board of Directors, issue a combined annual report, and, at the time of this suit, were represented by the same General Counsel. Thus David L. Yunich, the head of TA and named defendant in this action, had actual notice of the alleged violations and of the proposed suit, as did the General Counsel of TA, although the notice was addressed to both men in their capacities as MTA rather than TA officials.

15. "No action may be commenced—
    "(1) under subsection (a)(1) of this section—
    "(A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . . ."

The complaint, filed after the 60-day notice period had expired, again named as defendants the state and city officials and David L. Yunich "in his official capacity as chairman of the [MTA]." When plaintiffs later sought to amend their complaint to add the TA as a defendant, the latter moved to dismiss on the ground that the 60-day notice required by the Act had not been provided. The district judge accepted the TA's argument in light of "[s]tandards of fairness and due process" and dismissed the complaint. We hold this technical, crabbed reading of the statute's notice requirement to be clearly erroneous and reinstate the complaint as to the TA.

■ The district court's excessively restrictive construction of the citizen suit notice requirement is completely at odds with the announced purpose of the statute, which looks to substance rather than to form in an effort to facilitate citizen involvement. As the Senate Committee on Public Works, *supra*, at 36, noted in authorizing the establishment of regulations governing the notice requirement of § 304:

> "The regulations should not require notice that places impossible or unnecessary burdens on citizens but rather should be confined to requiring information necessary to give a clear indication of the citizens' intent."

Courts have consistently echoed the theme that the 60-day notice requirement is to be construed flexibly and realistically in order to further its essential purpose of providing "administrative agencies time to investigate and act on an alleged violation" rather than to hinder citizen participation. *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 84 n. 4 (2d Cir. 1975); *Conservation Society of South Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 938–39 (2d Cir. 1974), *vacated on other grounds*, 423 U.S. 1809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975).

Looking both to the letter of the statute and to the purposes underlying the citizen suit provision, plaintiffs adequately performed their responsibility of providing informative notice. Under the Act the parties required to be notified were the 'Administrator," § 304(b)(1)(A)(i), the "State in which the violation occurs," § 304 (b)(1)(A)(ii), and the "alleged violator," § 304(b)(1)(A)(iii). It is undisputed that the Administrator and the State were both notified. The only remaining question is whether the requirement of notice to the "alleged violator" obligates the citizen to give formal notice directly to all of the involved agencies of the State in addition to notice to the primary State officials. Since the agencies merely act as delegates of the State, we hold that it does not.

■ As the State of New York recognizes,[16] it, rather than its local agency, is responsible under the Act and relevant regulations for the creation and enforcement of its Air Pollution Abatement Plan, § 107(a), 42 U.S.C. § 1857c–2; 40 C.F.R. § 51.11(f). Although it may choose to act through designated agents such as the TA, such designation does not relieve the State of its responsibility to carry out the Plan. See 40 C.F.R. § 51.11(f). For purposes of receiving formal statutory notice, the State and its agencies therefore must be treated as one; service of notice upon the State is service upon the "alleged violator" within the meaning of § 304(b)(1)(A)(iii), since the State as the principal is legally responsible

---

16. In an affidavit submitted to the district court on August 1, 1975, the Assistant Attorney General of New York State acknowledged: "The State of New York is charged under the Federal Clean Air Act Amendments of 1970 . . . with the responsibility of achieving full compliance with national ambient air quality standards. . . . The State will exercise its full enforcement responsibility under the Act to insure Statewide compliance, including the City of New York."

17. Our interpretation does not render superfluous the third prong of the notice requirement. The apparent overlap between (ii) and (iii) will not arise when a private party, rather than a delegated public agency, is in violation of the Plan. In such an eventuality, the State still must be notified under (ii) while the private party, as "alleged violator," receives separate notice under (iii). See 40 C.F.R. § 54.2.

for the acts of its agent. The Act's notice requirement was therefore satisfied by service of notice upon the State as the alleged violator.[17]

■■■ Our interpretation of the Act's provision for citizen suit notice accords with EPA's own practice of treating notice to the State as notice to the TA. Before commencing suit under § 113(a)(1), 42 U.S.C. § 1857c–8(a)(1), the EPA must give notice of the violation to "the person in violation of the plan and the State in which the plan applies  .  .  .." On January 8, 1975, in issuing notices pursuant to this section for alleged noncompliance with the express bus strategy of the Plan, responsibility for which is delegated by the State to the TA, the EPA notified the State, not the TA directly, that the State and City of New York are "in violation of the Transportation Control portion of the New York City  .  . Plan." Subsequently it was the State, not the TA, that admitted violation of the strategy in a consent order dated April, 1975. The Act does not require or warrant the imposition of more onerous burdens of notice upon citizen plaintiffs than upon the EPA itself. As evident here, a state air pollution plan is likely to involve participation on the part of literally dozens of state and local agencies. To require that precise formalistic notice be provided to each is to erect wholly unrealistic barriers to citizen access to the courts as insured by Congress. The citizen would be relegated to a guessing-game reminiscent of strict common-law pleading long ago discarded.

Nor does the record support the district court's conclusion that the notice in this case violated "[s]tandards of fairness and due process." This statement first turns upon the court's erroneous assumption that the TA "is nowhere mentioned in the complaint." In fact, ¶ 44 of the Amended Complaint and the accompanying Table of Violations expressly refer to the Transit Authority as failing to perform its responsibilities under the Act. This complaint, which must be construed liberally, *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct.

2644, 41 L.Ed.2d 236 (1974); *Local 33, International Hod Carriers v. Mason Tenders*, 291 F.2d 496, 502 (2d Cir. 1961), is plainly sufficient in apprising the TA of the allegations leveled against it and the relief sought. Moreover, it is undisputed that actual notice was provided both to David L. Yunich and to the MTA. Regardless of the hat being worn by the joint officials of the MTA and TA, this notification in fact advised them of the proposed citizen suit and afforded them the requisite opportunity and time to investigate and to act on the alleged violation. This amply satisfies the language and spirit of the Act and the purposes to be served by a notice requirement under prevailing liberal pleading rules. Accordingly, we reinstate the TA as a defendant in action.

*Subject Matter Jurisdiction*

■■■ As a further ground for refusing to enjoin the transit fare increase the district court stated that "[t]here is also [a] substantial question in my mind as to whether this Court has subject matter jurisdiction over the fare increase," since jurisdiction was grounded upon the Clean Air Act, § 304(a)(1), and the Plan promulgated thereunder "does not contain any language prohibiting a fare increase." We agree that jurisdiction is not available in this enforcement proceeding to test the validity of the fare increase.

The citizen suit provision of the Act speaks in specific terms, conferring jurisdiction on the court to entertain any citizen suit claiming a violation of "an emission standard or limitation under this chapter" or of "an order issued by the Administrator or a State with respect to such a standard or limitation  .  .  ." § 304(a)(1). The stabilization of transit fares is not an expressed strategy of the Plan as adopted by the State, accepted by the E.P.A., and upheld by this court. *Friends of the Earth v. E.P.A., supra*, 499 F.2d at 1125. As a result, the fare increase is not an overt violation of the above provisions of § 304 and we lack subject matter jurisdiction to review the propriety of the TA's action.

In finding lack of jurisdiction to roll back the transit fare increase at this time, however, we hasten to point out that our earlier decision in *Friends of the Earth v. E.P.A., supra,* was predicated on the assumption that compliance with the Plan's other strategies, particularly those limiting parking spaces in business districts and providing express bus service, would achieve the overriding objective of "compelling [drivers] to use other modes of travel besides private automobile . . . ." See *id.* at 1125. This basic assumption has proven to be misguided. Noncompliance with most of the specified provisions of the Plan is undisputed, resulting in heavy increases in air pollution. Under present conditions, both the EPA [18] and state authorities [19] agree, furthermore, that the transit fare increase can be expected to produce approximately a 10% loss of rapid transit ridership, which would have an adverse influence on the Plan's central aim of inhibiting reliance on the automobile. Further, both apparently are in accord that a formal § 110 revision of the Plan may be necessary to take into account the fare rise.[20] Should these serious predictions prove to be accurate,[21] the EPA or citizen groups, of course, are free to seek appropriate revisions of the Plan under the Act. But such review does not rest upon § 304 and accordingly we are without jurisdiction to order transit fare relief.

### ENFORCEMENT OF THE PLAN

The primary relief sought by the citizen plaintiffs is enforcement of the Plan, which was approved by the EPA pursuant to §.110(a)(2) of the Clean Air Act, 42 U.S.C. § 1857c–5(a)(2), and upheld by this court some 20 months ago, *Friends of the Earth v. E.P.A., supra.* Specifically, the plaintiffs seek reversal of the district court's denial of partial summary judgment which would compel enforcement of the

**18.** At the request of Judge Duffy, Gerald M. Hansler, Regional Administrator of the EPA, on August 1, 1975, submitted a letter explaining the agency's position on the fare increase. The EPA flatly predicted that the hike will "induce more subway and bus passengers to use their cars," and noted that the EPA consequently may require a § 110 revision of the original plan requiring even "more effective pollution control measures. . . ." The Administrator also stated that the City's failure to impose toll fares upon the East and Harlem River Bridge crossings, as provided in the Plan, has deprived the City of a valuable source of revenue designed to substitute for transit fare increases; this complies with the State's position before this court during the first appeal of this case that the bridge tolls, in addition to encouraging carpooling and abating pollution directly, were intended "to raise revenues for the City mass transit system. . . ." In conclusion, the EPA held: "To reiterate, we believe that an increase in fares on [Transit Authority] subways and buses will detrimentally affect the public health and welfare and that other measures are available, and required by the present TCP [the Plan], which would avoid this harmful result."

**19.** In an affidavit submitted by New York State Assistant Attorney General James P. Corcoran, dated August 1, 1975, the State predicted a loss of ridership of approximately 10%, producing "an increase in vehicular traffic in the Manhattan central business districts, to the detriment of air quality in that area." But until the deterioration in air quality "can be projected with greater certainty," the State felt itself to be in an inadequate position "to assess what additional measures need to be undertaken," although it recognized that a formal § 110 revision of the Plan might be necessary to achieve the ambient air standards.

**20.** See the statements of the EPA and State officials, notes 18 and 19 *supra.*

**21.** The TA predicts a loss of ridership in the vicinity of 3–4%, but has not produced complete and organized figures to substantiate its prediction. Furthermore, none of the parties has attempted to accurately translate any resulting loss of ridership into increases in automobile usage. It is the reduction of the automobile as a source of pollution, rather than the gain of transit riders *per se,* that is the objective of the State's Plan.

**22.** See note 7 *supra.*

**23.** As noted previously, the EPA on January 8, 1975, cited the State for violations of these four strategies. In an affidavit submitted to the district court on August 1, 1975, the Assistant Attorney General of the State of New York acknowledged that these strategies presently are "under negotiation" and while agreement ostensibly "has been reached" with respect to taxi cruising and after-hours goods delivery, no orders effectuating any of the four strategies had yet been issued. Similarly, the City did not claim adherence to the four strategies in its papers below. Quite the contrary, the district

four strategies of the Plan [22] being violated by the State.[23] Plaintiffs also desire to pursue their claim that the State is in default in implementing the remaining strategies and to obtain judicial enforcement of these strategies. The plaintiffs' right under the Act to seek such an enforcement order is beyond challenge, § 304, 42 U.S.C. § 1857h–2. They have fully discharged their responsibility to provide statutory notice, § 304(b)(1)(A). Sixty days have passed without any action by the EPA or the State that would displace their citizen suit, § 304(b)(1). The district court, however, ordered that their action be dismissed "in its entirety unless the plaintiffs within 10 days" serve additional notice [24] on the EPA to induce the agency's intervention. The court reasoned that the "fact that the parties have advised that there are other orders presently under negotiation" between the State and the EPA "clearly [raises] a question of fact." Further, the court concluded that "the general policy is that the courts should not grant relief which requires continuous judicial supervision." Consequently, Judge Duffy in effect made the EPA an indispensable party to the action and rejected the task of judicial supervision as too onerous. We reverse and remand with instructions set forth below.

*EPA–State Negotiations*

■■■ In denying relief under the citizen suit provision the court referred to the existence of ongoing negotiations between the EPA and the State and City Authorities designed to reach consent decrees carrying out the Plan's mandated strategies. We join the district court in recognizing the utility of such deliberations and the desirability of attaining compliance through consensual means. But it is equally clear that the statute empowers neither the EPA nor the State to delay the approved Plan's strategies through negotiations, be they formal or otherwise. Negotiations are no substitute for enforcement and for timely compliance with the Plan's mandated strategies. Consequently, the district court erred in permitting the continuation of EPA–State discussions to bar suit by citizen groups seeking judicial enforcement of the Plan's expressed provisions. The Act authorizes only two procedural routes for modifying the Plan: a § 110(a)(3) revision or a § 110(f) postponement. In all other instances, the State is relegated to a lone option: compliance. See *Train v. N.R.D.C.,* *supra,* 421 U.S. at 89–90, 95 S.Ct. at 1486–1487, 43 L.Ed.2d at 751–752. *Metropolitan Washington Coalition for Clean Air v. District of Columbia, supra,* 511 F.2d at 811. As the Senate Committee that devised the citizen suit procedure made clear:

"[T]he factual basis for enforcement of [the Plan's] standards would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there had been

court literally was forced to "assume . . . that defendants would disagree with this allegation" of noncompliance with the Plan, and even here Judge Duffy was speaking specifically of the eight strategies to which administrative consent orders had been entered, not the four remaining strategies to which the State and City officials had formally refused to consent. See notes 10 and 11 *supra.*

24. Judge Duffy purported merely to require that plaintiffs serve the "proper notice" to the EPA under § 304(b)(1) of the Act. This characterization, however, is incorrect. Plaintiffs in fact served the "proper notice" on August 5, 1974, when they commenced their citizen suit. After Judge Duffy denied their first request for a preliminary injunction on December 16, the parties tried to reach accord through negotiations with the EPA. The failure of the negotiations and the increase in the subway fare prompted the citizen group to return to the district court and, through a show cause order dated July 28, 1975, to resume their request for a preliminary injunction based upon their 1974 complaint. Thus the plaintiffs were not obliged under the Act to give additional notice to the EPA when they had already provided the requisite statutory notice upon commencing the lawsuit; the district court's instruction to provide formal notice to the EPA in effect was a command for additional notice beyond that required by the Act. Moreover, it should be noted that the EPA was made aware of the reactivated lawsuit and was asked and permitted to participate; in response the agency chose to send a letter expressing its position. See note 18 *supra.*

compliance." Senate Committee on Public Works, *supra,* at 37.

The EPA–State conversations hardly satisfy either of the exclusive modification mechanisms authorized under the Act. In relying upon the negotiations as a basis for deferring enforcement, the district court in effect granted a *de facto* revision beyond that permitted by Congress and without any of the performance safeguards that precondition the granting of modifications and postponements under § 110 of the Act. Such a step plainly violates the statutory scheme and cannot be used to nullify the citizen's statutorily-guaranteed right of enforcement.

*EPA as an Indispensable Party*

For reasons already stated the district court's decisions to convert the EPA into an indispensable party and to deny relief because of the burdensomeness of the judicial supervision it would entail were clearly erroneous. The suggestion that, in compelling joinder of the EPA, the district court merely applied the broad discretion granted it under Rules 19 & 21, F.R.Civ.P. is unsound. The general authority thus vested in the judiciary to manage ordinary litigation does not entitle the court to contradict a clearcut, specific legislative scheme or to emasculate the citizen suit provision created by Congress. In doing so, and in denying citizen enforcement of the lawfully established Plan, the district court abused its discretion under the Act.[25]

## CONCLUSION

We are aware that enforcement of the air quality plan might well cause inconvenience and expense to both governmental and private parties, particularly when a congested metropolitan community provides the focal point of the controversy.[26] But Congress decreed that whatever time and money otherwise might be saved should not be gained at the expense of the lungs and health of the community's citizens:

"The protection of public health—as required by the national ambient air quality standards and as mandated by provisions for the elimination of emissions of extremely hazardous pollution agents—will require major action throughout the Nation. Many facilities will require major investments in new technology and new processes. Some facilities will need altered operating procedures or a change of fuels. Some facilities may be closed.

"The requirements for State action will be broadened. And the obligation of polluters will be greatly increased. What has been a program focused on uniquely critical areas, underfunded and inadequately manned, will become truly national in scope and will require an immediate increase in personnel and funding." Senate Committee on Public Works, *supra,* at 1. See also House Committee on Interstate and Foreign Commerce, H.R. Rep.No.91–1146, 91st Cong., 2d Sess., at 4–5 (1970).

The record before us is one that cries out for prompt and effective relief if the congressional clean air mandate is to have any meaning and effect in New York City. We cannot disregard the frank statement made by New York State's Assistant Attorney General some two years ago, that this "is a legally enforceable plan, . . . a legally adequate plan," and that "[i]f there is a

---

**25.** The further suggestion by defendants that EPA involvement was warranted to prevent conflicts in enforcement policy between the agency and citizen groups also is without merit. The citizen suit may only proceed in the event of agency inaction, § 304(b)(1)(B), and even then the EPA can participate in the creation and coordination of the judicial response by intervening as a matter of right. Furthermore, to enforce its own orders the EPA also must repair to the district court, § 113(b), 42 U.S.C. § 1857c–8, where the action can be consolidated with any pending citizen suit to insure uniformity of relief.

**26.** See e. g., *Metropolitan Washington Coalition for Clean Air v. District of Columbia,* 167 U.S.App.D.C. 243, 511 F.2d 809 (1975) (Washington, D.C.); *South Terminal Corp. v. E.P.A.,* 504 F.2d 646 (1st Cir. 1974) (Boston); *Commonwealth of Pennsylvania v. E.P.A.,* 500 F.2d 246 (3d Cir. 1974) (Philadelphia); *State of Texas v. E.P.A.,* 499 F.2d 289 (5th Cir. 1974), *stay denied,* 421 U.S. 945, 95 S.Ct. 1672, 44 L.Ed.2d 98 (1975) (major Texas cities).

valid legal ground for . . . a refusal [to enforce the plan], we have not been able to find it. . . ." Yet it is beyond serious dispute that the defendants are now almost a year in default in carrying out the principal strategies of the mandated Plan, which are central to achieving the primary ambient air quality standards prescribed by Congress, with the result that the public of New York City is exposed to carbon monoxide pollution that has in the meantime climbed to over five times the federal health standards. The court cannot consistently with its duty be a party to the delaying process that has led to this situation. The Senate Committee on Public Works, discussing the purpose of the citizen suit provision in its Report on the Clean Air Act Amendments of 1970, made this clear:

"If the Secretary and State and local agencies should fail in their responsibility, the public would be guaranteed the right to seek vigorous enforcement action under the citizen suit provisions of section 304.

\* \* \* \* \* \*

"The Committee believes that if the timetables established throughout the Act with respect to ambient air quality standards necessary to protect public health are to be met, the threat of sanction must be real, and enforcement provisions must be swift and direct. Abatement orders, penalty provisions, and rapid access to the Federal District Court should accomplish the objective of compliance." Senate Committee on Public Works, *supra,* at 20, 22.

Accordingly, we affirm the denial of the preliminary injunction restraining the transit fare increase.

In all other respects we reverse the district court's decision and remand the case to that court with the following instructions:

1. The Transit Authority should be reinstated as a defendant in the action;

2. Partial summary judgment should be entered in favor of plaintiffs, directing enforcement of the four strategies listed in note 7 *supra,* the court to take such

further steps as are necessary to insure enforcement of these strategies;

3. Further hearings should be held promptly to determine whether the defendants are in default in carrying out any of the remaining strategies and, if so, the court should enter such orders and take such other steps as are necessary to enforce those strategies being violated by the State.

Since time is of the essence in providing such relief as may be appropriate in this case, we direct that the case be given priority on remand and that, if Judge Duffy's schedule precludes his handling it promptly, the case be reassigned to another judge who is in a position to do so.

The mandate shall issue forthwith.