## NATIONAL CARLOADING CORPORATION V. PHOENIX-EL PASO EXPRESS, INCORPORATED.

No. 8152. Decided December 15, 1943.
Rehearing overruled January 19, 1944.
(176 S. W., 2d Series, 564.)

*Jones, Hardie, Grambling & Howell,* of El Paso, *Robert E. Quirk,* of Washington, D. C., and *P. J. Coughlin,* of New York City, for petitioners, National Carloading Corporation.

On the theory that if the express company did have the right to recover the difference in the freight rate prior to the enactment of the Act of the 77th Congress, they could not, after the passage of that act recover anything in this suit. Ewell v. Daggs, 108 U. S. 143, 27 L. Ed. 682, 2 Sup. Ct. 408; McNair v. Knott, 302 U. S. 369, 82 L . Ed. 307, 58 Sup. Ct. 245; Norman v. Baltimore & O. R. Co., 294 U. S. 240, 79 L. Ed. 885, 55 Sup. Ct. 407.

*Robert L. Holliday* and *Harold L. Sims,* both of El Paso, for respondent.

This suit having been filed and tried below prior to the passage of Act of the 77th Congress, it was error for the Court of Civil Appeals to hold that said act is applicable to this suit. United States v. American Sugar Refining Co., 202 U. S. 363, 26 Sup. Ct., 717, 50 L. Ed. 1149; Haggar Co. v. Helvering, 308 U. S. 389, 60 Sup. Ct. 337, 84 L. Ed. 340; State v. Humble Oil & Ref. Co., 141 Texas 40, 169 S. W. (2d) 707.

MR. JUDGE FOLLEY, of the Commission of Appeals, delivered the opinion for the Court.

This suit was filed by the Phoenix-El Paso Express, Inc., against the National Carloading Corporation to recover certain undercharges in the amount of $1,045.00 in connection with motor freight transported in 1937 from El Paso, Texas, to Phoenix, Arizona, by Phoenix-El Paso Express, then a partnership and now incorporated as Phoenix-El Paso Express, Inc., the latter company having succeeded to the rights of the partnership. In the trial court the Phoenix-El Paso Express, Inc., recovered judgment for $999.68. The Court of Civil Appeals at El Paso reversed such judgment and remanded the cause and ordered the trial court to dismiss the suit. The opinion of the Court of Civil Appeals is published in 178 S. W. (2d) 133.

Both parties filed applications for writs of error and both petitions were granted. Since this is true, in order to avoid confusion we shall give the parties their trial court designations. In this connection, we shall make no further distinction between the partnership, Phoenix-El Paso Express, and the corporation, Phoenix-El Paso Express, Inc.

The plaintiff is a common carrier engaged in interstate commerce and at all times here material was a Federal motor common carrier within the meaning of part II of the Interstate Commerce Act of 1935, and was authorized to, and did, transport freight under a certificate of public convenience and necessity issued by the Interstate Commerce Commission.

The defendant, National Carloading Corporation, was incorporated in 1931 and continuously since that time has conducted a nationwide freight-forwarding business. It is engaged in the undertaking of collecting at its terminals parcels of freight from various shippers throughout the United States and consolidating the same into carload and truck load lots, and then shipping such bulk quantities to its other terminals where they are distributed locally in smaller lots. The defendant owns no motor vehicle equipment, except at certain of its distribution centers, but engages the services of motor, rail or water carriers to perform the actual transportation between terminal centers. It maintains terminals in 81 cities of the United States and employs a staff of 2,259 persons, including 227 solicitors. Through personal solicitation and advertising it holds out to the public a complete service in transportation of small shipments of general commodities. It accepts freight for transportation from store-door to store-door, issuing bills of lading in its name covering the through movement, and assuming responsibility for the safe delivery of the goods. It publishes tariffs naming rates which are collected on its billing from shippers

and consignees. Shipments are transported from points of origin to defendant's concentration terminals by motor carriers whose services are engaged by defendant through participating agreements. The carriers thus engaged are participants in defendant's tariffs and recive as compensation for their services a division of defendant's through rates.

In 1936, 1937 and 1938 the defendant filed with the Interstate Commerce Commission its tariffs for through routes and joint rates attempting to comply with Secs. 216(c) and 217(a) of the Motor Carrier Act, 1935, 49 U. S. C. A. Secs. 316(c) and 317(a). Sec. 216(c) provides that "Common carriers of property by motor vehicle may establish reasonable through routes and joint rates, * * * with other such carriers * * * by railroad and/or express and/or water." Sec. 217(a) provides for the filing and publishing of tariffs by every common carrier showing all the charges for transportation between points on its own route and between points on its own route and points on the route of any other such carrier, or on the route of any common carrier by railroad, express or water, when a through route and joint rate shall have been established. The plaintiff and other participating carriers filed concurrence adopting and assenting to defendant's published tariffs and rates. It was under such published tariffs and concurrences that the plaintiff performed the services in 1937 which constitute the basis of this suit. Between July 28, 1937, and November 7, 1937, plaintiff transported for defendant nine truck load shipments from El Paso to Phoenix at defendant's published joint rate of forty-five cents per hundred weight. The parties stipulated that under the Arizona Motor Transport Association Tariff No. 1 the legal rate for such shipments was eighty-five cents per hundred weight, as shown by the tariffs of the plaintiff on file with the Commission. The rate of eighty-five cents was, of course, the local rate between El Paso and Phoenix and was not a joint or participating rate for a through route over a longer distance. Each of the shipments in question was made under a straight bill of lading or shipping order issued by the defendant which stipulated that the property was received subject to classifications and tariffs in effect on the date of its issue. For these nine shipments of goods, which had been concentrated at El Paso by the defendant and which were admittedly interstate commerce, plaintiff was paid by defendant the total sum of $1,123.16. This amount was based upon the rate of forty-five cents per hundred pounds. If the published local rates of the plaintiff had been charged for these shipments, rather than the joint published rates of the defendant for the through routes, the charges therefor would have been $2,122.84, which is $999.68

in excess of the amount actually collected. The latter amount, as above stated, was the recovery allowed by the trial court.

Sec. 217(b) of the Interstate Commerce Act, 1935, 49 U. S. C. A. Sec. 317(b) provides that no common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation than the rates, fares, and charges specified in the tariffs in effect at the time. It appears that the suit of the plaintiff is founded on the theory that at the time the shipments were made the defendant was not a common carrier by motor vehicle, or a contract carrier by motor vehicle, within the meaning of the Motor Carrier Act of 1935, and thus was not authorized to file tariffs or joint rates with the Commission, nor to participate in a joint rate or tariff with the plaintiff or other motor carriers. The plaintiff contends that under Sec. 217(b), prohibiting deviation from rates in published tariffs, and by reason of the above stipulation in the bills of lading that the property was "received subject to classifications and tariffs in effect," the defendant was obligated to pay, and the plaintiff to collect, the full legal tariffs in effect at the time, which, it asserts, was eighty-five cents per hundred weight. The basis for such contention arises from certain orders and rulings of the Interstate Commerce Commission, as will hereinafter appear.

On February 10, 1936, the defendant, for the first time, filed application with the Interstate Commerce Commission for a certificate of public convenience and necessity under the "grandfather" clause of Sec. 206(a) of the Motor Carrier Act, 1935, 49 U. S. C. A. Sec. 306(a). Prior to such date the defendant had operated without any certificate of authority. Sec. 206(a) makes it unlawful for any "common carrier by motor vehicle" subject to the provisions of the Act to engage in interstate or foreign operation on any public highway unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations, subject to the following proviso, which contains the so-called "grandfather" clause:

*"Provided, however,* That, subject to section 310, if any such carrier * * * was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, * * * the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate was made to the

Commission as provided in paragraph (b) of this section and within one hundred and twenty days after October 1, 1935, * * *."

On January 4, 1940, the Commission entered its order denying the application of the defendant for a certificate of public convenience and necessity. The Report of the Commission, accompanying such order of denial, shows that the action of the Commission was upon the theory that the defendant was not a common carrier by motor vehicle under the provisions of the Motor Carrier Act, 1935, because its undertaking was not to transport property but merely to see to it that goods were transoprted, using for this purpose the services of carriers with whom it had contractual arrangements. The Commission concluded that the applicant was neither a common carrier by motor vehicle nor a contract carrier by motor vehicle under the provisions of the Act, and, as authority for such conclusion, cited its order denying the application of Acme Fast Freight, Inc. The latter company and five others similarly situated filed suit in the United States District Court, Southern District of New York, against the United States and the Interstate Commerce Commission seeking to set aside the order of the Commission refusing to issue certificates of public convenience and necessity. In an opinion dated January 8, 1940, that court, in upholding the order of the Commission, held that forwarding companies engaged in collecting small shipments of goods, consolidating them and reshipping them in bulk using only the transportation facilities of others, were not "common carriers by motor vehicle," within the meaning of the Motor Carrier Act of 1935, and hence were not entitled to certificates of public convenience and necessity. Acme Fast Freight, Inc., v. United States, 30 F. Supp. 986, affirmed by the Supreme Court of the United States (memorandum opinion) 309 U. S. 638, 60 Sup. Ct. 810, 84 L. Ed. 993.

On May 7, 1940, the Commission determined that the operations of the defendant and its tariffs and joint rates filed with the Commission were in all essential respects similar to those of the Acme Fast Freight, Inc., and ordered such tariffs stricken from its files because the same were not in consonance with Sec. 217 (a) of the Motor Carrier Act of 1935. This order was founded upon the same theory as the earlier order denying defendant's certificate of public convenience and necessity. On the same day the order of May 7, 1940, was entered the Commission entered a second order to the effect that the first order should take effect on June 11, 1940. Thereafter, from time to time, successive orders were entered postponing the effective date of the order

of May 7, 1940. On March 13, 1941, the following order was entered:

"The Interstate Commerce Commission has been advised by the Advisory Commission to the Council of National Defense that in its judgment the cancellation under our outstanding orders of the joint rates between freight forwarders and motor carriers 'would be detrimental to the national defense program.' In view of this advice, and also of the progress which is now being made by the Congress with respect to legislation for the regulation of freight forwarders and of communications which it has received from the House Committee on Interstate and Foreign Commerce and the Chairman of the Senate Committee on Interstate Commerce, the Commission has felt justified in further postponing the dates of the outstanding orders from March 16, 1941, to July 1, 1941."

Thereafter, other postponing orders were entered from time to time by the Commission until Congress passed part IV of the Interstate Commerce Act in 1942 with reference to freight forwarders, after which the order of May 7, 1940, was indfinitely suspended by the Commission.

Part IV of the Interstate Commerce Act deals extensively with the operations of freight forwarders and regulates their activities in general, including their duties, powers, permits, rates, charges, accounts, records, reports, liabilities and practices. Sec. 419 of part IV, 49 U. S. C. A . Sec. 1019, outlines in a very sweeping manner the liability of freight forwarders for past acts and omissions. The defendant interposes such section as a complete defense to this suit. It is as follows:

"No person shall be subject to any punishment or liability under the provisions of this chapter and chapters 1, 8, and 12 of this title on account of any act done or omitted to be done, prior to the effective date of this chapter, in connection with the establishment, charging, collection, receipt, or payment of rates of freight forwarders, or joint rates or divisions between freight forwarders and common carriers by motor vehicle subject to this chapter and chapters 1, 8, and 12 of this title."

It was by virtue of the above provision that the Court of Civil Appeals held that the defendant was not liable for the undercharges claimed. In fairness to the trial court it should be stated that at the time of the trial of this case, which was in October 1941, Congress had not enacted part IV of the Interstate Commerce Act, and thus the trial court was without benefit of such law.

■ We think the Court of Civil Appeals was correct in its conclusion that the quoted section from the 1942 amendment is a complete bar to the recovery of the plaintiff. As above stated, plaintiff's suit is predicated upon Sec. 217(b) which made it obligatory upon the plaintiff to collect from defendant the full legal tariffs in effect at the time of the shipments, which would mean that the plaintiff should have collected eighty-five cents per hundred pounds unless the defendant was entitled under the Motor Carrier Act to file tariffs and participate in joint rates with plaintiff on the basis of forty-five cents per hundred weight from El Paso to Phoenix. Therefore, the suit of the plaintiff is not based upon a contract or agreement but arises by reason of special statutory authority.

■ It is generally conceded that a right of action given by a statute may be taken away at any time, even after it has accrued and proceedings have been commenced to enforce it. 16 C. J. S. 675, Sec. 254. It is also well settled that if a statute giving a special remedy is repealed without a saving clause in favor of pending suits, all suits must stop where the repeal finds them, and if final relief has not been obtained before the repeal becomes effective, it cannot be granted thereafter, and the repeal deprives the court of jurisdiction of the subject matter. Goodrich v. Wallis, 143 S. W. 285; Dickson v. Navarro County Levee Imp. Dist. No. 3, 135 Texas 95, 139 S. W. (2d) 257. Of course, in each instance the status of the action or claim depends upon the legislative intent, to which question we shall now address our attention.

■ We recognize the general rule that a statute shall not be given retroactive effect unless such construction is required by explicit language or necessity implication. United States v. St. Louis S. F. & T. R. Co., 270 U. S. 1, 70 L. Ed. 435, 46 Sup. Ct. 182. However, from the specific language of Sec. 419, supra, and that of the report of the legislative committee hereinafter shown, we are convinced that the provision was intended to have and does have a retroactive effect. The immunity granted extends to liabilities for "any act done or omitted to be done, *prior to the effective date of this chapter,* in connection with the establishment, charging, collection, receipt, or payments of rates of freight forwarders, or joint rates or divisions between freight forwarders and common carriers. * * *." (Italics ours). We doubt that more explicit language could have been used to indicate the legislative intent that the provision should have a retroactive effect. Our view in this respect is further strengthened by the report of the Committee on Interstate and Foreign

Commerce, as shown by House Report No. 1172, 77th Congress, 1st Session. While the report of such Committee is not controlling, it is persuasive and is entitled to the great respect as reflecting the legislative intent. This report states that the Commission, recognizing the chaotic conditions which would result if its orders in the Acme case became effective before Congress had an opportunity to enact appropriate legislation relating to freight forwarders, had postponed the effectiveness of such orders. It further states that during the time Congress had such legislation under consideration, the Commission from time to time had made further postponements. It also states that the "Committee believes that immediate legislation is the logical and only effective means of preserving the freight-forwarding industry, and retaining for the shipping public the inherent advantages of this mode of transportation." On page 18 of this report, with reference to Sec. 419 regarding liability for past acts and omissions, we find this language:

"As has been previously explained in this report, freight forwarders and common carriers by motor vehicle subject to part II have been for a number of years operating under joint rates which, by reason of the decision of the Commission in the Acme case, and in the other freight forwarder cases, they probably had no authority to establish and observe, even though the Commission's orders in those cases have not yet become effective. As a result of this, various persons may have subjected themselves to penalties and liabilities under Federal statutes, even though during the period of operation under such joint rates there may have been no deliberate intention to violate the law and no way of knowing for certain whether they were violating the law. Freight forwarders may be liable on account of failure to pay the regular published tariff rates on common carriers by motor vehicle. Common carriers by motor vehicle may be subject to liability because of failure to collect from freight forwarders their regularly published local rates. It is possible that shippers may also technically be subject to liabilities.

"This section relieves freight forwarders, common carriers by motor vehicle, and other persons from penalties and liabilities under the Interstate Commerce Act or any other Federal statute on account of anything done or omitted to be done, prior to the enactment of part IV, in connection with the establishment, charging, collection, receipt or payment of rates of freight forwarders, or joint rates or divisions between freight forwarders and common carriers by motor vehicle subject to part II.

"Common law and contractual rights, remedies, and liabilities are not affected by this provision.

"The validity of this section, insofar as it relieves persons of liability of fines, penalties, and forfeitures running to the United States is beyond doubt, and insofar as it relieves persons of liability to individuals good authority exists for such action.

"The courts are generally agreed that rights of action based upon purely statutory grounds may be abolished by the legislature even after they have accrued (16 C. J. S. Constitutional Law, Sec. 254; Ewell v. Daggs, 108 U. S. 143 (1883) ; Hazzard v. Alexander, 36 Del. 212, 173 A. 517 (1934) ; Wilson v. Head, 184 Mass. 515, 69 N. E. 317 (1904) ; cf. Carson v. Gore-Meenan, 229 Fed. 765, 767 (1916). The courts have been particularly uniform in reaching this conclusion where the right of action is in the nature of a claim by an individual for the recovery of a statutory fine, penalty, or forfeiture (Ewell v. Daggs, 108 U. S. 143 (1883) ; Lemon v. Los Angeles Terminal Co., 38 C. A. (2d) 659, 109 P. (2d) 387 (1940) ; Anderson v. Byrnes, 122 Calif. 272, 54 P. 821 (1898) ; Denver & R. G. Ry. Co. v. Crawford, 11 Col. 598, 19 P. 673, 674 (1888). The authority of Congress or a State legislature to validate voluntary transactions between parties which at the time they were entered into were by statute invalid or illegal has been upheld by the United States Supreme Court in several cases (West Side R. R. v. Pittsburg Construction Co., 219 U. S. 92 (1910) ; McNair v. Knott, 302 U. S. 369, 372 (1937)."

We think there can be no doubt from this report that the Committee entertained the view that it was essential to afford relief to both carriers and shippers from the hardships which would be imposed from the decision in the Acme case, and that such relief could be effective only if the provision as to past liabilities was given a retroactive effect.

The plaintiff asserts that it has a vested right in the recovery herein and urges that to give a retroactive effect to the provision in question is violative of the Fifth Amendment of the Constitution of the United States, which prohibits deprivation of property without due process of law. With this contention we cannot agree. We are here dealing with the exercise by Congress of a power conferred by the Federal Constitution to regulate interstate commerce. The provisions of the Fifth Amendment may not be invoked to obstruct a national policy which Congress has the power to adopt. As illustrative of this principle is the case of Norman v. Baltimore & O. Ry. Co., 294 U. S. 240, 307, 79 L. Ed. 885, 902, 55 Sup. Ct. 407, where Norman brought suit

on an interest coupon of a bond providing for payment in gold coin equal to the standard weight and fineness existing on February 1, 1930. The coupon was payable February 1, 1934. In June 1933 Congress passed a joint resolution declaring that "every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount of money of the United States measured thereby" is "against public policy." In January 1934 the President, under the authority vested in him by the Congress, reduced the standard of weight and fineness of the gold dollar. Norman asked for judgment for an amount based upon the former value of the gold dollar and invoked the above amendment of the Constitution as giving him the right of recovery. Mr. Chief Justice Hughes, in overruling this contention, in delivering the opinion of the court said:

"This argument is in the teeth of another established principle. Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of porperty, but when contracts deal with a subject matter which lies within the control of the Congress, they have a congenial infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. See Hudson Water Co. v. McCarter, 209 U. S. 349, 357, 52 L. Ed. 828, 832, 28 S. Ct. 529, 14 Ann. Cas. 560.

"This principle has familiar illustrations in the exercise of the power to regulate commerce. If shippers and carriers stipulate for specified rates, although the rates may be lawful when the contracts are made, if Congress through the Interstate Commerce Commission exercises its authority and prescribes different rates, the latter control and override inconsistent stipulations in contracts previously made. This is so, even if the contarct be a charter granted by a State and limiting rates, or a contract between municipalities and carriers."

We think it therefore becomes evident that the plaintiff does not possess such a vested right as to come within the inhibition of the Fifth Amendment. Such a right must be something more than a mere expectation based upon an anticipated continuance of existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from the demand of another. If, before rights become vested in particular individuals, the convenience of the State induces amend-

ment or repeal of the laws upon which they are based, these individuals are left without any remedy at law to enforce their claims; and if final relief has not been granted before the repeal goes into effect it cannot be granted thereafter, even if a judgment has been entered and the cause is pending upon appeal. The general rule is that when such law is repealed without a saving clause, it is considered, except as to transactions past and closed, as though it had never existed. Lewis' Sutherland on Statutory Construction, 2nd Ed. 544, Sec. 284; ibid 548, Sec. 284; Phil H. Pierce Co. v. Watkins, 114 Texas 153, 263 S. W. 905; Galveston H. & H. R. Co. v. Anderson, 229 S. W. 998 (writ refused); Dickson v. Navarro County Levee Imp. Dist., supra; South Carolina v. Caillard, 101 U. S. 433, 25 L. Ed. 937, 16 C. J. S. 646, Sec. 223; 6 R. C. L. 309, Sec. 296.

The judgment of the Court of Civil Appeals reversing that of the trial court and ordering the cause dismissed, will be affirmed.

Opinion adopted by the Supreme Court December 15, 1943.

Rehearing overruled January 19, 1944.