JIM WALTER HOMES, INC., Appellant,

v.

William F. GIBBENS and Phyllis Jean Gibbens, Appellees.

No. 16330.

Court of Civil Appeals of Texas, San Antonio.

Sept. 30, 1980.

Rehearing Denied Oct. 29, 1980.

William H. Daniel, McGinnis, Lochridge & Kilgore, Austin, Morris Atlas, Gary Gurwitz, Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, McAllen, for appellant.

Don Krause, Bayne, Snell & Krause, San Antonio, Hector Gonzalez, Sinton, for appellees.

## OPINION

KLINGEMAN, Justice.

This is an appeal by Jim Walter Homes, Inc., from a summary judgment granted to William F. Gibbens and wife, Phyllis Jean Gibbens, awarding the Gibbens recovery for alleged violation of Chapter 6 of the Texas Consumer Credit Code, Article 5069–6.01 et seq. Appellant will sometimes be hereinafter referred to as "Jim Walter" or "defendant," and appellees as "Gibbens" or "plaintiffs."

On June 9, 1976, the Gibbens entered into a contract with Jim Walter which provided that Jim Walter would build a new home for the Gibbens on their unencumbered property in Sandia, Texas, for a cash price of $20,860, plus a finance charge of $22,682, for a total of $43,542, with the total amount to be repaid in 180 monthly installments of $241.90 each. The contract disclosed that the annual percentage rate was 11.4%. To secure payment of this contract Jim Walter acquired a first deed of trust lien on the Gibbens' property.

The pre–printed form contract of Jim Walter here involved includes in bold print the statement that "the buyer also acknowledges that he had the election of purchasing either for cash or upon a time price basis and has elected to purchase on the time price basis." The contract here involved is virtually the identical type of form as the contract construed and passed on by this court in *Anguiano v. Jim Walter Homes, Inc.*, 561 S.W.2d 249 (Tex.Civ.App.–San Antonio 1978, writ ref'd n.r.e.). In *Anguiano*, this court held that such a financial arrangement was a "time price differential" and was not an "interest transaction" and was governed by Chapter 6 of the Consumer Credit Code, Article 5069–6.01 et seq., and that such contract violated Chapter 6. In 1977, the Legislature passed certain amendments to the Consumer Credit Code, the applicable provisions of which will be hereinafter discussed, and which are sometimes referred to as the "cure" or "savings" amendments. Shortly after the decision by this court in *Anguiano*, Jim Walter sent to the Gibbens a letter attempting to correct the violations of Chapter 6 held by this court in *Anguiano*. The letter in part stated it would refund the portion of payment previously paid and attributed to the time price differential charge in excess of an annual percentage rate of 10% and stated that in addition the amount of the future monthly payments would be decreased to reflect the reduction of the time price differential to an annual percentage rate of 10%. No formal release of its first lien was sent or tendered to the Gibbens by such letter but such letter had certain provisions thereon that the mortgage lien would be waived under certain stated conditions or contingencies set forth in the letter. On March 10, 1978, Jim Walter forwarded to the Gibbens a check representing the refund hereinabove referred to, and new coupon books for reduced payments in the future.

Thereafter, appellees filed suit against Jim Walter in the District Court of Jim Wells County, Texas, alleging that Jim Walter had violated Chapter 6 of the Texas Consumer Credit Code by taking a first lien on real estate and also alleging that Jim Walter had violated the Texas Deceptive Trade Practices–Consumer Protection Act in connection with the sale and construction

of the house. Gibbens moved for partial summary judgment on their Chapter 6 claim and this motion was granted by the trial court. Thereafter, plaintiffs non–suited their deceptive trade practices claim and final judgment was entered for plaintiffs upon their claim for the Chapter 6 violations.

On this appeal, Jim Walter asserts that the trial court erred in granting the Gibbens' motion for summary judgment on their claim that the contract violated Chapter 6 of the Texas Consumer Credit Code by providing for its first lien on the real estate involved because (1) the evidence conclusively established or at least raised a fact question that if Jim Walter violated Chapter 6, it cured such violations in accordance with the provisions of Article 5069–8.01(c); (2) the contract involved is not covered by and is not a Chapter 6 transaction; (3) if such contract is covered by Chapter 6 and violates the first lien prohibition contained in Chapter 6, Article 5069–6.05(7), such prohibition violates Article I, section 3, and Article XVI, sections 37 and 50, of the Texas Constitution, and is unconstitutional under the Texas Constitution.

■ We first consider Jim Walter's contention that the transaction here involved is not a Chapter 6 transaction and is not governed by the terms and provisions of Chapter 6. Such contention is based on two premises: (1) this court in *Anguiano* incorrectly held that the transaction was a Chapter 6 transaction; that such holding creates numerous problems and this court should reconsider its original holding; (2) if such transaction was originally a Chapter 6 transaction, the so–called cure letters of February 22 and March 10, 1978, sent out by Jim Walter to the Gibbens, transformed the transaction from a "time price differential transaction" to an "interest transaction," and as so restructured the transaction is no longer a Chapter 6 transaction and does not violate Chapter 6.

The contracts involved in *Anguiano* and the case herein are the same form of contract and are virtually identical in their provisions. In *Anguiano*, this court held that a financial arrangement in which the landowners were to pay the contract of Jim Walter a cash price of $13,910 plus a finance charge of $13,124, for a total amount of $29,034, to be repaid in 180 monthly installments of $161.30 each, with an annual percentage rate of 11.4%, was a "time price differential transaction" and was not an "interest transaction" and that such contract fits squarely within the definition of "retail installment transaction" and is within and was covered by Chapter 6 of the Credit Code. Jim Walter now reiterates basically the same contentions in this connection as made in *Anguiano* as to why the transaction is not a Chapter 6 transaction. We again reject this contention and adhere to our holding in *Anguiano*.

With regard to Jim Walter's contention that the changes and restructuring contained in the letters of February and March, 1978, changed or transformed the transaction so that it was no longer a Chapter 6 transaction, we have examined and reviewed such letters and find nothing therein that would change such transaction from a "time price differential transaction" to an "interest transaction," or that would remove it from the coverage of Chapter 6. We reject Jim Walter's contention in this regard.

■ Jim Walter's basic contentions herein made and the primary thrust of its appeal is that, assuming it was guilty of any violations of the Texas Consumer Credit Code in the original transaction, it cured such violations under the terms and provisions of the 1977 amendment to the Credit Code, the so–called "cure statute," and relieved itself of any penalty for violating the Credit Code.

In 1977, the Legislature passed the statute sometimes referred to as the "cure statute," and the pertinent portion of such statute here involved, Article 5069–8.01(c), provides as follows:

(c)(1) A person has no liability to an obligor for a violation of this Subtitle or of Chapter 14 of this Title if within 60 days after having actually discovered such vio-

lation such person corrects such violation as to such obligor by performing the required duty or act or by refunding any amount in excess of that authorized by law.

Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(c)(1) (Vernon Supp. 1971–1979).

In 1977 the Legislature also amended Chapter 6 of the Credit Code, and the applicable amendment, Article 6.05(7), here involved, in pertinent part reads as follows:

No retail installment contracts shall:

.    .    .    .    .

(7) Provide for or grant a first lien upon real estate to secure such obligation, except . . . (b) <u>such lien as is provided for or granted by a contract or series of contracts for the sale or construction and sale of a structure to be used as a residence so long as the time price differential does not exceed an annual percentage rate of 10 percent.</u> (amending language underscored)

Tex.Rev.Civ.Stat.Ann. art. 6.05(7) (Vernon Supp. 1971–1979).

On January 18, 1978, this court held in *Anguiano* that Jim Walter's contract, structured as the one here involved, was governed by Chapter 6 of the Texas Consumer Credit Code, Article 5069–6.01 et seq., and such contract violated Chapter 6 because it provided for a first lien on real estate.

Shortly after the *Anguiano* decision was handed down, Jim Walter on February 22, 1978, mailed to the Gibbens a letter purporting to correct the violations of Chapter 6, in which letter Jim Walter stated it would refund that portion of payments previously paid and attributable to the time price differential charged in excess of an annual percentage rate of 10% per annum, and stated that future payments would be decreased to reflect the reduction of the time price differential as a percentage rate of 10%. On March 10, 1978, Jim Walter sent to the Gibbens a check making a refund of that portion of previous payments made in excess of 10%, as hereinabove discussed, and also sent new payment coupons to be used in connection with the reduced

future payments. The Gibbens cashed the refund check and began making payments at the reduced rate.

We have concluded that Jim Walter's acts and conduct after the passage of the cure statute were in compliance with the terms and provisions of such statute for curing violations and were effective to cure the violations charged against it, and that under the terms of the statute so amended, Jim Walter has no liability to the Gibbens for such violation. We have reached this conclusion for the reasons hereinafter set forth.

■ I. The Gibbens' contract with Jim Walter was entered into in 1976, and their house was completed prior to the 1978 *Anguiano* decision. As in *Anguiano*, the rate provided in the contract was 11.4% per annum and the note was secured by a first lien on the house being constructed. The cure provisions of the statute were enacted in 1977. Shortly after the *Anguiano* decision, Jim Walter sent its so–called curative letter to the Gibbens on February 22, 1978. It is Jim Walter's contention that under the clear language of Article 8.01(c), a creditor may cure a violation (1) by performing the required duty or act, or (2) by refunding any amount in excess of that authorized by law. Appellees assert that in a contract structured as the one here involved, they must release the lien, irrespective of whether they reduce the amount or refund the amount involved or not. They argue that the transaction was a "time price differential" transaction rather than an "interest" transaction and that every mechanic's lien contract which contained a finance charge expressed as a time price differential is illegal if it provides for a first lien on real estate even though the rate of return on the contract is 10% or less per annum. We reject this contention. Both *Anguiano* and the cure statutes offer appellant a choice: (1) release the lien and retain its rates in excess of 10% per annum, or (2) keep its lien but reduce its rates to 10% per annum.

■ Clearly, the purpose of the cure statute is to allow creditors to cure past violations and thereby relieve themselves of

strict penalties. It is illogical to assume that the Legislature intended to provide for a cure or remedy that is impossible to perform, that is, change a "time price differential" transaction into an "interest" transaction after the contract has been entered into and executed. The clear purpose and intent of Article 8.01(c) is to authorize and encourage ex post facto actions. Appellant's cure actions and procedure fully and concisely complied with the express wording and policy of the statute involved.

Where a statute is designed to relieve from the rigors of forfeiture it should be most liberally construed to accomplish that purpose. *Freels v. Walker*, 120 Tex. 291, 26 S.W.2d 627 (1930); *Gulf Production Co. v. State*, 231 S.W. 124 (Tex.Civ. App.–San Antonio 1921, write ref'd). The dominant rule controlling the construction of a statute is to ascertain the intention of the Legislature. An act should be given a fair and sensible construction in order to carry out the purposes for which it was enacted and not be construed in such a manner as to nullify or defeat its purposes. *Brazos River Conservation and Reclamation District v. Costello*, 135 Tex. 307, 143 S.W.2d 577 (1940). We hold that Jim Walter's cure letters of February and March, 1978, complied with the purpose, intent and letter of the statute and were effective to cure the violation for which it was charged and were effective to relieve Jim Walter of any liability for such violation.

II. Jim Walter also asserts that no penalty may be assessed against it because its contract as corrected pursuant to Article 8.01(c) complies with the 1977 amendment to Chapter 6.

As hereinbefore set forth, in 1977 the Texas Legislature amended Article 6.05(7) to remove the prohibition on first liens securing a home construction contract in Chapter 6 when the finance charge on the contract is limited to 10% per annum. The amendment was effective May 4, 1977. In February and March, 1978, prior to the institution of this suit, Jim Walter refunded and restructured appellees' contract to reduce the rate to 10% per annum. Prior to

filing suit appellees accepted the refund check and paid monthly installments at the reduced rate.

The 1977 amendment should be given effect for three reasons: (a) the 1977 amendment was fully in effect at the time of the events in issue (the cure and refund and the institution of the suit); (b) Jim Walter should not be penalized in 1979 for violation of the statutory prohibition eliminated by the 1977 amendment to Article 6.05(7); and (c) under well settled authority in Texas the 1977 amendments to Article 6.05(7) and Article 8.01(c), being remedial and curative in nature, are to be liberally construed to accomplish their purpose of remedying the problem under the old law.

III. The Gibbens contend that the 1977 amendment to Chapter 6 should not be applied retroactively and, in support of such contention, they cite and rely on *Coastal Industrial Water Authority v. Trinity Portland Cement Division, General Portland Cement Co.*, 563 S.W.2d 916 (Tex.1978), and other cases holding generally that statutes will not be applied retroactively unless it appears by fair implication from the language used that it was the intention of the Legislature to make it applicable to both past and future transactions. However, *Coastal* is distinguishable in several respects from the case before us, and applying the rule set forth in *Coastal* we do not construe the Legislative intent as suggested by appellees. In the case before us, appellant's cure action occurred after the amendment to Chapter 6 was in effect. On the date of appellant's actions in question–the cure letters of February and March, 1978, in which appellant made its refunds and restructured appellant's contract to provide for a rate of return of 10% per annum–the law provided that the appropriate rate of time price differential for first lien transactions under Chapter 6 was 10% per annum. 1977 Tex. Gen.Laws, ch. 104, § 1, at 212; Tex.Rev.Civ. Stat.Ann., art. 5069–6.05 (Vernon Supp. 1978–1979).

In our opinion the purpose and intent of Article 5069–8.01(c) is to allow a creditor to unilaterally amend the contract

in the consumer's favor, in order to bring it into compliance with the law. The purpose of such statute is to encourage retroactive change to correct practices found abusive by the Legislature. The Legislature determined in 1977 that there is no abuse in retaining a first lien in a home construction contract subject to Chapter 6 so long as the rate of return is limited to 10% per annum, and we find no logic or reason to assess a penalty for retaining a first lien where the law so allows it where the rate is so limited.

IV. Jim Walter also contends that in any event it cannot be subjected to a penalty based on a repealed statutory prohibition, which no longer is in effect. Appellees' case is premised on a prohibition against first liens which existed under Article 6.05(7) prior to 1977. As hereinbefore noted, the Texas Legislature amended that statute in 1977 prior to the filing of this suit to repeal the prohibition insofar as it applies to contractual provisions for first liens securing contracts to construct a residence when a finance charge does not exceed 10% per annum. Appellant's restructured contract fully complies with the 1977 amendment to Chapter 6, and its provision for a first lien clearly complies with the law in effect on the date of the cure, on the date of the filing of this suit, and at present.

■ Appellees argue vigorously that statutory amendments are not ordinarily applied retroactively. It is noteworthy that the cure amendments here involved do not contain a savings clause. The Texas authorities have not treated amendments which eliminate statutorily created causes of action as retroactive. The Texas authorities are unequivocal in holding that in the absence of a savings clause, the amendment or repeal of a statute abrogates all causes of action based upon the old law.

1. The United States Supreme Court in *Yeaton v. United States*, 9 U.S. (5 Cranch) 281 (1809), at page 282, stated:

[I]t has been long settled, on general principles, that after the expiration or repeal of a law, no penalty can be enforced, nor punish-

In *Dickson v. Navarro County Levee Improvement District No. 3*, 135 Tex. 95, 139 S.W.2d 257 (1940), the Texas Supreme Court held:

It is almost universally recognized that if a statute giving a special remedy is repealed, without a saving clause in favor of pending suits, *all suits must stop where the repeal finds them*; and, if final relief has not been granted before the repeal goes into effect, it cannot be granted thereafter. *A like general rule is that if a right to recover depends entirely upon a statute, its repeal deprives the court of jurisdiction over the subject matter.* [Citations omitted] [emphasis added].

139 S.W.2d at 259.

In *Aetna Insurance Co. v. Richardelle*, 528 S.W.2d 280 (Tex.Civ.App.–Corpus Christi 1975, writ ref'd n.r.e.), the court stated:

If, before a right becomes vested in a person, the law upon which it is based is repealed, that particular person no longer has a remedy to enforce his claim, and if final relief has not been granted to him on the enforcement of a demand before such repeal, then no relief can be granted on his demand after the effective date of the repeal.

. . . . .

The repeal of a statute extinguishes any right that depends solely on the statute repealed, unless the repealing act directly or by fair implication reserves the right. [citations omitted] [1]

528 S.W.2d at 284.

■ The supreme court in *National Carloading Corp. v. Phoenix–El Paso Express, Inc.*, 142 Tex. 141, 176 S.W.2d 564 (1943), cert. denied, 322 U.S. 747, 64 S.Ct. 1156, 88 L.Ed. 1578 (1944), set forth the applicable law as follows:

ment inflicted, for violation of the law committed while it was in force, unless some special provision be made for that purpose by statute.

*See also United States v. Chambers*, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934).

If, before rights become vested in particular individuals, the convenience of the State induces amendment or repeal of the laws upon which they are based, these individuals are left without any remedy at law to enforce their claims; and if final relief has not been granted before the repeal goes into effect it cannot be granted thereafter, even if a judgment has been entered and the cause is pending upon appeal. The general rule is that when such law is repealed without a saving clause, it is considered, except as to transactions past and closed, as though it had never existed.

176 S.W.2d at 570. *See also Trinity Universal Insurance Co. v. McLaughlin*, 373 S.W.2d 66 (Tex.Civ.App.–Austin 1963, no writ).

Appellee also cites and relies on *National Carloading* but construes such case differently from appellant and as in support of the general rule disfavoring retroactive application of statutes. However, the statutory provision involved in *National Carloading* was not a modification or repeal of an existing provision of law. *National Carloading* recognizes and approves the *Dickson* repeal rule cited and relied on by appellant. The case before us does not involve the addition of a new statute to the law as in *National Carloading* but a repeal–the removal of an existing statutory prohibition from the law.[2]

■■■ The 1977 amendment before this court differs from that involved in *National Carloading* and is similar to *Dickson* as the amendment was modification of an existing statute, and repealed and withdrew the first lien prohibition as to contracts with rates of 10% or less. The amendment did not affect existing contract rights but withdrew the buyer's statutory remedy of recovery of a penalty for first lien prohibitions involving rates of 10% or less.

At the time Jim Walter reduced its rates to 10% per annum and at the time the Gibbens filed this suit, Chapter 6 allowed a provision for a first lien in contracts with rates of 10% per annum or less, and did not assess any penalty for such provision. Appellant's cure brought the contract into compliance with the law in existence on the date of the cure and appellees have no statutory remedy to recover a penalty based on a legal prohibition which the Legislature eliminated before the cure and before this suit was filed.

We have concluded that Jim Walter's actions after the passage of the saving amendment heretofore discussed were effective to cure the violations charged against it and that Jim Walter has no liability to the Gibbens for such cured violation.

Because of our holding, we do not deem it necessary to discuss appellant's other points of error.

The judgment of the trial court is reversed and this cause is remanded to the district court for further proceedings in accordance with this court's opinion.

CADENA, Chief Justice, dissenting.

I do not agree that appellant, Jim Walter Homes, Inc., has corrected the clear violation of Article 5069–6.05(7) in the manner required by Article 5069–8.01(c)(1).

All references to the Texas Consumer Credit Code in this opinion will be made without including the prefix Article 5069. For example, Article 5069–6.05(7) will be referred to simply as 6.05(7).

On June 9, 1976, the date of execution of the contract involved in this case, 6.05(7) provided that no retail installment contract should provide for or grant a first lien on real estate to secure the obligation evidenced by the contract "except such lien as is created by law upon the recording of an abstract of judgment." In *Anguiano v. Jim Walter Homes, Inc.*, 561 S.W.2d 249 (Tex. Civ.App.–San Antonio 1978, writ ref'd n.r. e.), this court held that a contract executed by appellant, similar to the one now before us, was a "retail installment contract" and was subject to the provisions of the Consumer Credit Code, including 6.05(7). *Anguiano* expressly held that the retention by

---

**2.** *See* 1A C. Sands, Statutes and Statutory Construction §§ 22.36, 23.12, 23.33 (4th ed. 1972).

appellant of a first lien in such contract which provided for an annual percentage rate, as does the one now before us, of 11.4%, was a violation of 6.05(7).

In 1977, 6.05(7) was amended to prohibit provisions in a retail installment contract creating a first lien upon real estate "except (a) such lien as is created by law upon the recording of an abstract of judgment or (b) such lien as is provided for or granted by a contract or series of contracts for the sale or construction and sale of a structure to be used as a residence, so long as the time price differential does not exceed an annual percentage rate of 10 percent." The *Anguiano* decision was based on the wording of 6.05(7) prior to the 1977 amendment, but it is clear that the amendment wrought no change in the law as applied in *Anguiano* since *Anguiano* explicitly recognized that a mechanic's lien could be created so long as the interest rate did not exceed 10%. 561 S.W.2d at 254.

There can be no doubt that the contract before us violated the prohibition contained in 6.05(7), even after the 1977 amendment became effective, since it provides for a first lien and a time price differential in excess of an annual percentage rate of 10%. The statement in the majority opinion that Jim Walter "should not be penalized in 1979 for violation of the statutory prohibition eliminated by the 1977 amendment to Article 6.05(7)" is simply not true, since the amendment merely authorized the retention of a first lien in retail installment contracts if the annual percentage rate does not exceed 10%.

If Jim Walter has absolved itself of liability it can only be because, as required by 8.01(c)(2), within 60 days after it "actually discovered" the violation, it corrected the violation.

The majority's conclusion that Jim Walter corrected the violation assumes that the violation of 6.05(7) was completely corrected when Jim Walter reduced the time price differential rate from 11.4% to 10% and made the refund of prior payments required by such reduction. As pointed out in the majority opinion, at no time did Jim Walter

release the first lien. The majority holding is based on the theory that by reducing the annual percentage rate from 11.4% to 10% and by making the refund and reducing the amount of the required future payments to conform to such reduced annual percentage rate, Jim Walter "unilaterally amended the contract in the consumer's favor," bringing such contract into full compliance with the law. That is, while the original contract, providing for an annual percentage rate of 11.4% and providing for a first lien, violated the statute, the new contract, created by Jim Walter's unilateral amendment, provides for an annual percentage rate of only 10%, so that the contract, thus "unilaterally amended" is in compliance with 6.05(7).

There can be no doubt that Jim Walter at least attempted a unilateral amendment of the contract. But some skeptics might question the assertion that the unilateral amendment was "in the consumer's favor." The contract was unilaterally changed from one calling for an annual percentage rate of 11.4%, unsecured by a first lien, to one calling for an annual rate of 10%, with payment of the debt secured by an enforceable first lien. As a result of this unilateral amendment, the consumer realized a total saving of $3,294.00 over a 15–year period, or a saving of $18.30 monthly. As a result of its unilateral amendment of the contract, Jim Walter, instead of having an unsecured debt, now has a debt secured by a first lien on the consumer's real estate and has, according to the majority opinion, relieved itself of a liability in the amount of $45,-364.00, all at a cost of $18.30 a month. A suspicion that Jim Walter "unilaterally amended" the contract at least partially for its own benefit is justified. There is also some reason to believe that the legislative purpose in adopting 8.01(c)(1) was not to "benefit the consumer" but to relieve violators of the Consumer Credit Code from liability.

The majority opinion does not pinpoint the date on which Jim Walter actually discovered the violation involved in this case, nor does the brief of appellant mention a specific date which must be considered in

order to determine whether the corrective action was, in fact, taken within 60 days of its actual discovery. But it can be fairly assumed that both the majority opinion and the contentions of Jim Walter are based on the assumption that Jim Walter actually discovered the violation on January 18, 1978, the date on which the opinion in *Anguiano* was handed down, or, perhaps, on February 15, 1978, the date on which this Court overruled Jim Walter's motion for rehearing in *Anguiano*. In any event, the soundness of the majority opinion necessarily depends on the assumption that Jim Walter did not discover the violation prior to December 24, 1977, a date 60 days prior to February 22, 1978, the date of the "correction letter." If Jim Walter actually discovered the violation prior to December 24, 1977, it did not take the corrective action with the 60 days prescribed by the statute.

The *Anguiano* opinion was delivered on January 18, 1978. This Court may, I think, take judicial notice of the fact that if the opinion in a case appealed to this Court was handed down on January 18, 1978, the pleadings specifically pointing out the illegal provisions in the *Anguiano* contract, including the violation of 6.05(7), were filed and served on Jim Walter prior to December 24, 1977.

Jim Walter's theory, which the majority clearly accepts, necessarily is that it did not actually discover the violation of 6.05(7) until this Court rendered its decision on January 18, 1978, and that it took the required corrective action within 60 days of that date. That is, the theory is that a violation of a statute is actually discovered by the violator only when he discovers not only all of the relevant facts but also the legal significance of such facts, so that he cannot discover a violation of a statute until an appellate court tells him that his conduct amounts to a violation.

Jim Walter's contention must be rejected. The only reasonable construction of "actually discovered such violation" is that the violation is actually discovered when there is an actual discovery of the facts which constitute the violation. The requirement that corrective action be taken within 60 days after the discovery of the violation is, as far as the right to correct is concerned, in the nature of a statute of limitations. It is well settled that a cause of action based on fraud must be commenced within two years after discovery of the fraud. All that is required to commence the running of limitations is that the plaintiff discover the facts which constitute fraud. When the defendant has shown discovery of such facts by plaintiff, plaintiff may not plead that, while he had knowledge of the facts, he did not know that, under applicable legal rules, such facts constituted fraud. Jim Walter's contention in this case is nothing more than a plea of ignorance of the law.

As pointed out in the majority opinion, the contract in this case consists of a printed form identical to that used by Jim Walter in the *Anguiano* case. The pre-printed portion of both contracts embodies the provisions for a first lien. According to the affidavit filed by Jim Walter in the trial court and its brief in this Court, that form of contract has been used in thousands of cases.

The second paragraph of 8.01(c)(1) provides that the actual discovery of a violation in one transaction may constitute actual discovery of the same violation in other transactions if the violation actually discovered "is of such a nature that it would necessarily be repeated and would be clearly apparent in such other transactions without the necessity of examining all such other transactions."

There is no basis for holding that Jim Walter did not actually discover the violation prior to December 24, 1977. The facts and circumstances of this case conclusively establish actual discovery of such violation prior to that date. The "correction" attempted on February 22, 1978, therefore, was not made within the 60-day period required by 8.01(c)(1).