TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00497-CV







State of Texas, et al./Operating Contractors ABS Emissions, Inc., et al., Appellants


v.



Operating Contractors/State of Texas, et al., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 95-14621, HONORABLE JOSEPH H. HART, JUDGE PRESIDING






 Appellant, the State of Texas, et al. (the "State"), and appellee, the Operating
Contractors (the "OCs"), et al., bring cross appeals from the judgment of the trial court awarding
the OCs approximately $16 million in damages under the Texas and United States constitutions
and approximately $7 million in attorney's fees under the Uniform Declaratory Judgment Act (the
UDJA") (1) due to the State's alleged unconstitutional repeal of a centralized automobile emissions
testing program. We will reverse and render judgment that the OCs take nothing.


BACKGROUND

 In response to amendments made by Congress to the Federal Clean Air Act in 1990,
the United States Environmental Protection Agency (the "EPA") mandated periodic testing of
vehicle exhaust emissions in certain geographic areas having high levels of air pollution. See 42
U.S.C. § 7401 (1994). In 1992, the EPA designated three such "non-attainment areas" in the state
of Texas: the Dallas/Fort Worth, Houston/Beaumont/Port Arthur, and greater El Paso areas. To
encourage compliance with the new federal air pollution standards, Congress conditioned the
availability of federal highway funds on the actions of state governments in bringing state
emissions testing programs into compliance with EPA guidelines. See 42 U.S.C. §§ 7509,
7410(m) (1994).

 Accordingly, the Texas Legislature in 1991 authorized the Texas Air Control
Board, the predecessor to the Texas Natural Resource Conservation Commission (the
"TNRCC"), (2) to modify the existing state emissions testing program to better comply with the new
EPA guidelines. (3) The TNRCC designed a program whereby vehicle registration would be
dependent upon successful emissions testing performed by a centralized testing facility equipped
with high-technology equipment. The TNRCC submitted the proposal, or state implementation
plan ("SIP"), to the EPA for approval. Prior to formal EPA approval, the 1993 Legislature
provided express authority to the TNRCC to contract with private entities to implement and
operate the new program. See Tex. Health & Safety Code Ann. § 382.037(f) (West 1992); Act
of May 24, 1993, 73d Leg., R.S., ch. 547, § 2. With EPA approval still pending, the TNRCC
contracted with Tejas Testing One and Tejas Testing Two (collectively "Tejas") to manage the
implementation and operation of the new program in two of the three non-attainment areas: 
Dallas/Fort Worth and Houston/Beaumont/Port Arthur. Tejas signed two identical Emissions
Contracts (collectively the "Emissions Contract") with the State which established the
responsibilities of the two contracting parties and covered a period of seven years. The EPA
formally approved the Texas plan a year later.

 The structure of the new program required Tejas, as the Managing Contractor, to
construct and staff numerous emissions testing facilities in the Dallas/Forth Worth and
Houston/Beaumont/Port Arthur areas. Pursuant to the Emissions Contract, Tejas hired local OCs
to run each individual testing facility. Each of the forty-three OCs signed both a lease with Tejas
leasing the testing facility from Tejas, and a Service Agreement with Tejas establishing the
obligations and responsibilities of the two contracting parties. (4) The OCs signed no contract
directly with the State.

 The Emissions Contract between Tejas and the State and the Service Agreement
between each OC and Tejas contained exculpatory clauses designed to deal with the possibility of
an early termination of the new emissions testing program. The Emissions Contract contained a
provision stating:


9.3 Early Termination of the Contract without Fault by Managing Contractor.


The TNRCC may terminate this Contract in the absence of fault by the Managing
Contractor . . . . if the Program is repealed or substantially amended . . . . If this
contract is terminated by the TNRCC prior to the Normal Termination Date for any
such reason, the TNRCC agrees, to the extent funds are appropriated by the
Legislature of the State of Texas for the express purpose of this section 9.3, to pay
to the Managing Contractor the compensation described in this section 9.3 for
property used or intended to be used in the performance of this Contract. The
TNRCC agrees to take all steps necessary to request such funding from the
Legislature. (emphasis added).



The Service Agreement likewise contained a clause addressing the early termination of the
program:


31. Termination of the Emissions Contract or the Lease(s):


 OC recognizes that both the TNRCC and Tejas have the right under the
Emissions Contract to terminate the Emissions Contract prior to the date on which
this agreement is to terminate in accordance with section 8 of this Agreement. In
the event (i) the TNRCC or Tejas terminates the Emissions Contract, or (ii) the
Lease(s) terminates, then this Agreement shall automatically terminate without
further action or notice. Termination of this Agreement pursuant to this section 31
of this Agreement shall immediately and automatically terminate the Lease(s). OC
agrees that it shall have no claim for damages against Tejas or any other person,
including but not limited to the TNRCC and Tejas' lessors, mortgagees, lenders and
assignees, in the event the TNRCC or Tejas terminates the Emissions Contract.
(emphasis added).



Tejas and the OCs made significant investments of time and money to ensure that the emissions
testing program would be operational at the agreed time. In return for this investment, Tejas stood
to recoup its costs and to gain an estimated $77 million in profits over the seven year term of the
Emissions Contract. Testimony by one OC at trial estimated each OC's annual salary over the
seven year period to be $140,000. On January 2, 1995, the new emissions testing program
became operational.

 By the opening of the 1995 Legislative Session, political support for the new
centralized emissions testing program had begun to erode. In addition, the legislature may have
been responding to rumors that Congress was going to relax the EPA emissions testing standards. (5) 
Whatever the reason, after only four weeks of operation, the Texas Legislature placed a 90-day
moratorium on the program. See Tex. S.B. 19, Act of Jan. 31, 1995, 74th Leg., R.S., ch. 1. 
Senate Bill 19 ("S.B. 19") suspended operation of the program, and also appropriated $8.8 million
in order to make payments to the OCs for salaries, bonuses, and maintenance of the stations during
the moratorium. Following the 90-day moratorium, the legislature passed laws permanently
ending the centralized emissions testing program and reestablishing a decentralized program. (6) See
Tex. S.B. 178, Act of May 1, 1995, 74th Leg., R.S., ch. 34. Senate Bill 178 ("S.B. 178") further
provided that:


SECTION 13. Any change or amendment to the vehicle emissions inspection and
maintenance program allowed or contemplated by this Act, including any change
or amendment to that program negotiated and agreed to by the governor:


(1) is an amendment or repeal of that program under any contract for
implementation of that program;


(2) does not constitute a default by the state under a contract for implementation of
that program;


(3) is not a waiver of the state's defenses available under law or under any existing
contract for the implementation of that program; and


(4) does not waive the state's sovereign immunity or any defenses available to the
state.



Id. (emphasis added). The OCs were reimbursed by Tejas for all start-up costs incurred during
the development and operation of the ill-fated program.

 The TNRCC made some effort to redesign the program with Tejas to fit the new
political desire for decentralization, but these efforts failed. The TNRCC estimated Tejas's losses
and petitioned the legislature for the return of that investment. Pursuant to S.B.178, the TNRCC
designed a new emissions testing program and submitted it to the EPA in June 1996. The EPA
approved the new program in July 1997. See 62 Fed. Reg. 37138-44, 40 C.F.R. § 52.2310
(1997).

 After filing for bankruptcy protection in September, Tejas filed suit in district court
against the State in November 1995. The OCs intervened. Both Tejas and the OCs challenged
the state legislation ending the emissions testing program on a number of grounds, including both
constitutional and contractual claims. The trial began in January 1997, and final judgment was
signed on April 21, 1997. The trial court found that S.B. 178 amounted to an unconstitutional
impairment of contract under both the Texas and United States Constitutions, and an
unconstitutional taking and unconstitutional retroactive law under the Texas Constitution. See
U.S. Const. art. I, § 10; Tex. Const. art. I, §§ 16, 17. The trial court, however, found against
Tejas and the OCs on their breach of contract claims. The trial court awarded Tejas nearly $170
million in damages, interest, and attorney's fees. The trial court awarded the OCs approximately
$23 million in damages and attorney's fees. The monetary awards represented lost profits
estimated over the entire seven-year term contemplated by the Emissions Contract and Service
Agreement. After entry of the final judgment, the State settled with Tejas. The dispute between
the OCs and the State was not settled, and is now before this Court on cross-appeals. The State,
in several points of error, appeals the judgment awarding the OCs $23 million. The OCs, in four
points of error, appeal the trial court's failure to include pre-judgment interest in the award of
damages, and appeal the trial court's failure to recognize their contract claims as an alternative
basis of recovery.


STANDARD OF REVIEW

 The ultimate determination of whether a statute acts in violation of the constitution
is one of law, and thus is reviewed de novo. See City of College Station v. Turtle Rock Corp., 680
S.W.2d 802, 804 (Tex. 1984).


DISCUSSION

 We begin by examining the OCs' strongest argument: that S.B.178 comprised an
unconstitutional taking under the Texas Constitution. The OCs argue that their interest in the
Service Agreement rises to the level of a vested right; that each OC was essentially awarded a
franchise by the State. Furthermore, by virtue of the State's legislative and administrative
interference with the emissions program, these vested rights were "taken." The State argues that
the Service Agreement entitled each OC to only an expectancy that the law would remain the
same, and that there can be no taking because the OCs possessed no vested right. The State
contends that the protections of both the Texas and U.S. Constitutions extend only to vested
rights. (7) Thus, the threshold question involves whether the OCs can claim a vested right.


Vested Rights 

 The State attacks the OCs' claim of a vested right in the continuation of the
centralized emissions testing program. The line of the State's argument proceeds as follows: (1)
the State, as a sovereign, cannot be sued for money damages without its consent, except for a
takings claim; (8) (2) because the State has not given consent, the OCs can only recover under a
takings claim; (3) the constitutional safeguard of "no taking without just compensation" present
in the Texas and U.S. Constitutions refers only to vested property rights; (4) the OCs had no
vested rights in the State's continuation of its emissions testing policy; (5) therefore, the OCs
cannot recover.

 Before analyzing the State's argument, it is important initially to distinguish the
nature of the right at issue. Texas has long recognized that, pursuant to article one, section
seventeen of the Texas Constitution, a governmental taking of real property requires "just
compensation." A landowner is subject to the eminent domain power of the State, but the State
must award just compensation for the taking of property. See Green Int'l, Inc. v. State, 877
S.W.2d 428, 433 (Tex. App.--Austin 1994, writ dism'd); see also Long Island Water-Supply Co.
v. City of Brooklyn, 166 U.S. 685, 689 (1897) ("All of private property is held subject to the
demands of a public use. The constitutional guaranty of just compensation is not a limitation of
the power to take, but only a condition of its exercise."). Conversely, state courts have generally
denied recovery from the State for contract damages advanced under the rubric of a constitutional
takings claim. See Green, 877 S.W.2d at 433; Corpus Christi v. Acme Mechanical Cont., 736
S.W.2d 894, 903-04 (Tex. App.--Austin 1987, writ denied) ("The concept of a taking as a
compensable claim has limited application to the relative rights of the parties when those rights
have been voluntarily created by contract."). (9) In a contractual arrangement, "whenever the
government acts within a color of right to take or withhold property, . . . the government cannot
be said to have effected a taking because there was no intent to take, only an intent to act within
the scope of the contract." (10) Green, 877 S.W.2d at 434. The State argues that S.B. 178 concerns
the proper exercise of the State's police power, and therefore the State acted within a color of right
under the contract. Thus, without a vested right protected by the constitution, the OCs cannot
establish the necessary intent for their takings claim.

 The OCs, however, advance the theory that their contractual interest in the
emissions testing program itself amounted to a vested right through the operation of the Service
Agreement in conjunction with the Emissions Contract, and that this vested contractual right
deserves constitutional protection similar to real property. The OCs further argue that S.B. 178's
interference with the performance of the Service Agreement and Emissions Contract amounted to
a taking; in other words, that governmental interference with their alleged vested rights can be
construed as a governmental taking rather than a mere breach of contract. The OCs cite federal
law to support this position. See, e.g., United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); 
Lynch v. United States, 292 U.S. 571 (1934).

 In United States Trust, the states of New Jersey and New York attempted to repeal
an earlier covenant with Port Authority bondholders that limited the ability of the Port Authority
of New York and New Jersey to subsidize rail passenger transportation from bond revenues and
reserves. The Supreme Court of the United States held that the covenant created a contractual
relationship between the states and the bondholders, and that the statutory repeal violated the
contract clause of the United States Constitution by diminishing the pledged revenues and reserves. 
United States Trust, 431 U.S. at 32. In Lynch, the United States Congress attempted to repeal the
yearly renewable term insurance policies established in the War Risk Insurance Act. The Supreme
Court of the United States held that Congress lacked the power to extinguish the contractual rights
of beneficiaries under the yearly renewable term policies, although it had the power to take away
the remedy. Lynch, 292 U.S. at 582-83.

 We need not decide whether these federal cases compel the conclusion that contract
rights can rise to the level of a vested right deserving constitutional protection because the situation
in the instant cause is distinguishable from the cases relied upon by the OCs. The covenant at
issue in United States Trust constituted an explicit contract between the states and the Port
Authority bondholders, and the statutory language of the covenant purposefully invoked the
constitutional protection of the contract clause. United States Trust, 431 U.S. at 18. Similarly,
in Lynch, the War Risk Insurance Act authorized contracts with individual insureds who paid
monthly premiums as consideration for the government's obligation. Lynch, 292 U.S. 575-76. 
In contrast, the OCs have no contract with the State.

 Furthermore, both United States Trust and Lynch speak to situations where the
legislation at issue primarily intended to eliminate or diminish the financial obligations of the
governmental entity. The legislation in the instant cause had as its purpose the exercise of the
police power of the State to regulate air pollution, and affected the State's financial obligations
only tangentially. (11) This distinction between the instant cause and the cited authority arises from
the applicable constitutional power under which each contested piece of legislation was passed;
"the police power and the power of eminent domain were among those that could not be
'contracted away,' but the State could bind itself in the future exercise of the taxing and spending
powers." United States Trust, 431 U.S. at 23-24. Thus, the Supreme Court has struck down
legislation that impaired existing contracts intending primarily to diminish the government's
financial obligations; it has upheld legislation which impaired existing contracts, but which
exemplified a legitimate exercise of the State's police power. See Home Building & Loan Ass'n
v. Blaisdell, 290 U.S. 398 (1934). Because the OCs had no privity of contract with the State, and
because S.B. 178 flowed from the State's inherent police power, we find the federal precedent
established by United States Trust and Lynch to be inapposite.

 The OCs can find support in Texas case law for the proposition that the
government's interference with a franchise implicates the takings clause and requires payment of
just compensation. A franchise is a special privilege conferred by government upon an individual
or organization which does not belong to the citizenry at large, and in which activity one otherwise
could not engage without the franchise. See West Tex. Util. Co. v. City of Baird, 286 S.W.2d
185, 187 (Tex. Civ. App.--Eastland 1956, writ ref'd n.r.e.). Under Texas law, a franchise
impresses its owner with vested rights. See Brazosport Sav. & Loan Ass'n v. American Sav. &
Loan Ass'n, 342 S.W.2d 747 (Tex. 1961). However, not every grant of an exclusive privilege
constitutes a franchise. See Johnson v. Austin, 674 S.W.2d 894, 897 (Tex. App.--Austin 1984,
no writ).

 Franchises under Texas case law generally take the form of utilities, or other
monopolies, created to further the public interest. See Texas Power & Light v. City of Garland,
431 S.W.2d 511 (Tex. 1968) (electric utility); Brazosport Sav. & Loan, 342 S.W.2d at 750
(savings and loan associations); City of Jacksonville v. General Tel. Co., 538 S.W.2d 253 (Tex.
App.--Tyler 1976, writ ref'd n.r.e.) (telephone utility). Moreover, there must exist a contract
between grantor and grantee which is mutually binding and enforceable. City of Jacksonville, 538
S.W.2d at 255. Whether an instrument, ordinance, or contract amounts to a franchise depends
largely upon the manner of its performance in compliance with its terms. See City of Wichita Falls
v. Kemp Hotel Operating Co., 162 S.W.2d 150, 153 (Tex. Civ. App.--Fort Worth), aff'd, 170
S.W.2d 217 (Tex. 1942). There exists strong evidence that the State granted Tejas a franchise to
manage emissions testing facilities under the terms of the Emissions Contract. That issue,
however, is not before this Court.

 The OCs would like to argue that they also were granted individual franchises with
the State to run each particular emissions testing station. We disagree. As previously established,
the OCs signed no contract directly with the State. Their inclusion in the emissions testing
program came about only through an intermediary: Tejas. One who claims a franchise right or
privilege in derogation of the common rights of the public must prove his title thereto by a grant
clearly and definitely expressed, and cannot enlarge it by equivocal or doubtful provisions or
probable inferences. Incorporated Town of Hempstead v. Gulf States Util. Co., 206 S.W.2d 227,
230 (Tex. 1947). The grant of a franchise is construed in favor of the public, and, if the language
used is ambiguous, the grant is to be construed in favor of the grantor and against the grantee. 
Id.; see also 37 C.J.S. Franchises, § 19 (1997); 41 Tex. Jur. 3d Franchises, § 7 (1998). Nothing
passes by implication by the grant of a franchise except what may be necessary to give effect to
the obvious intent of the grant. Id. The Emissions Contract refers to the OCs only in the general
terms necessary to outline the program and to define the obligations of Tejas to staff and maintain
the emissions testing program. There is no language ambiguous or otherwise conferring franchises
on the OCs. Thus, any franchise granted by the State was granted exclusively to Tejas. We hold
that the OCs held no franchise.

 Because the OCs cannot claim franchisee status, their interest in the emissions
testing program did not rise to the level of a vested right. Because the OCs did not have vested
rights in the continuation of the emissions testing program, they suffered no taking. Although the
lack of any vested property rights in the continuation of the testing program is itself sufficient to
reverse the trial court's award of damages based on constitutional violations, we will also discuss
the Service Agreement signed by the OCs that similarly restricts the ability of the OCs to recover
damages.


The Exculpatory Clause

 The OCs could acquire no franchise because the OCs signed no contract with the
State. Therefore, the OCs' formal relationship with the State existed only to the extent that the
Service Agreement between Tejas and the State provided for their role in the centralized emissions
testing program. Because that relationship was created by the Service Agreement, the OCs'
relationship with the State terminated when that agreement was terminated.

 The State advances the argument that the language of S.B. 178 itself acted to
terminate the emissions testing program and the contractual relationship between Tejas and the
State. Consequently, S.B. 178 similarly activated the exculpatory clause in the Service
Agreement. The State argues that the exculpatory clause in the Emissions Contract, entitled Early
Termination of the Contract without Fault by Managing Contractor, allowed the State to terminate
the contract with Tejas without fault should the program be "repealed or substantially amended." 
The State further argues that the language of S.B. 178, specifically Section 13(1), states that the
bill acts as "an amendment or repeal of that program under any contract for implementation of that
program"; this speaks directly to the Emissions Contract and actuates the termination clause. 
Thus, according to the State, the emissions testing program terminated at the time the legislature
passed S.B. 178. And, by virtue of the language in the Service Agreement that "[i]n the event the
TNRCC or Tejas terminates the Emissions Contract . . . then this Agreement shall automatically
terminate without further action or notice . . . ," and the "OC agrees that it shall have no claim
for damages against Tejas or any other person, including but not limited to the TNRCC . . . ,"
the OCs have no legal recourse.

 The OCs agree that the legislature intended with its language in S.B. 178 to repeal
the program, but claim that the legislature lacked the authority to so act. The OCs argue that once
the original SIP was approved by the EPA as a means of enforcing federal environmental
standards, only a repeal or substantial amendment approved by the EPA could terminate the
contract and end the emissions testing program. The OCs cite Friends of the Earth v. Carey, 535
F.2d 165 (2nd Cir. 1976), (12) for the proposition that a delegated program retains its legal force
despite ongoing negotiations between the EPA and a state to amend the program. The trial court
agreed with the OCs and found that the emissions testing program could not have been legally
repealed without formal EPA approval, and therefore the termination clause was not actuated by
the language in S.B. 178. We disagree.

 We find Friends of the Earth to be unpersuasive. The position of the OCs implies
that federal Supremacy Clause doctrine (13) compels the legislature to refrain from action until
obtaining new approval by the EPA. Consideration under the Supremacy Clause begins with the
basic assumption that Congress did not intend to displace state law. Maryland v. Louisiana, 451
U.S. 725, 746 (1981). A finding that state legislation violates the supremacy clause requires a
finding of at least one of the following: (1) the subject matter of the state law has been preempted
by Congress; (2) the state law prevents the achievement of a federal objective; or (3) there is an
actual conflict between the state and federal law. See Maryland, 451 U.S. at 746-47. In allowing
states to regulate delegated environmental programs according to programs developed by state
legislatures, the SIP program itself provides evidence that Congress has not preempted state
regulation of air pollution. Furthermore, before commencement of trial, Congress passed
legislation preventing the EPA from requiring states to adopt centralized testing programs. See
National Highway System Designation Act of 1995, § 348 (P.L. 104-59, November 28, 1995). 
Thus, the federal objective was in harmony with the State's objective in amending the SIP. 
Finally, the State petitioned the EPA for approval of a substantially amended SIP, which would
comply with new federal guidelines. Formal approval of the amended SIP by the EPA occurred
in July 1997. 62 Fed. Reg. 37138-44, 40 C.F.R. § 52.2310 (1997). Thus, there was neither an
actual conflict between state law and federal law, nor was there any interference with a federal
objective. The Supremacy Clause did not block S.B. 178's repeal of the centralized emissions
testing program.

 The language of S.B. 178 could not have been clearer in its intent to repeal the
centralized emissions testing program. The language of both the Emissions Contract and the
Service Agreement clearly contemplates just such an eventuality. The Service Agreement signed
by each OC even included a waiver of the legal right to sue for damages. "[T]he right of property
is subject to the reasonable exercise of the police power of the State." See State v. Texas City, 295
S.W.2d 697, 704 (Tex. Civ. App.--Galveston), aff'd, 303 S.W.2d 780 (Tex. 1956). The
establishment of an emissions testing program falls squarely within the legitimate public purpose
of regulating air quality. Therefore, S.B. 178 constituted a reasonable exercise of the police
power of the legislature. As such, its repeal of the emissions testing program terminated both the
Emissions Contract and the Service Agreement.


The OCs' Constitutional Claims

 Applying the above analysis to the trial court's specific findings, we must reverse
the judgment. Because the OCs lack a contract with the State, their interest in the continuation
of the emissions testing program cannot be characterized as a vested property right, either under
the federal authority cited by the OCs, or under an analysis of Texas franchise law. Without a
vested right, the OCs cannot claim constitutional protection under either federal or state takings
doctrine. Additionally, the contracts themselves compel the conclusion that any rights held by the
OCs ended when the legislature terminated the program. Furthermore, because S.B. 178 was a
valid exercise of the State's police power, "it does not matter that legislation appropriate to that
end 'has the result of modifying or abrogating contracts already in effect.'" Blaisdell, 290 U.S.
at 435. Under these circumstances there could be no unconstitutional impairment of contract.


Sovereign Immunity

 The OCs claim the trial court erred in not finding in their favor regarding two
alternative bases for the damage award: (1) that the Emissions Contract and the Service
Agreement should be read together as "one contract," and that the TNRCC breached that contract;
and (2) that the OCs were third party beneficiaries of Tejas's Emissions Contract with the State. 
The OC's must construct a theory of contractual recovery based upon the Emissions Contract due
to the waiver clause included in the Service Agreement (that the OCs shall have no claim for
damages should the Emissions Contract be terminated). Both of these theories, while novel, share
the same fatal flaw. The Texas Supreme Court has recently held that, while the State waives its
immunity from liability upon contracting with a private entity, the State retains its immunity from
suit unless the legislature expressly waives its sovereign immunity. See Federal Sign v. Texas S.
Univ., 951 S.W.2d 401, 408-09 (Tex. 1997). "It is the [l]egislature's sole province to waive or
abrogate sovereign immunity." Id. at 409. S.B. 178 contains language expressly stating that the
legislation repealing the emissions testing program "does not waive the state's sovereign immunity
or any defenses available to the state." Thus, the legislature retains its immunity from any
contractual claims advanced by the OCs. (14) We agree with the trial court and overrule the OCs'
two points of error regarding their contractual claims.


CONCLUSION

 The OCs maintained no vested right in the continuation of the centralized emissions
testing program. Without a vested right, the OCs could not claim constitutional protection. 
Furthermore, sovereign immunity and the OCs' explicit waiver barred any contractual claim
against the State. We therefore reverse the trial court's award of damages. Because we reverse
the trial court's award of damages, we fail to reach the OCs' complaint regarding prejudgment
interest. Similarly, because we render judgment that the OCs take nothing, we need not address
the State's appeal of the trial court's award of attorney's fees.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Powers*

Reversed and Rendered

Filed: January 28, 1999

Publish















* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. See Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 1997).
2. For convenience, we will refer to both the Texas Air Control Board and the TNRCC
collectively as the TNRCC.
3. Prior to 1990, Texas had a decentralized emissions testing program; any qualified auto
repair shop or gas station could perform emissions testing.
4. The relevant obligations of each OC under the terms of the Service Agreements were
identical. For convenience, we refer to the agreements collectively as the "Service Agreement."
5. Congress did relax emissions testing standards in November 1995: "The Administrator of
the [EPA] shall not require adoption or implementation by a State of a test-only I/M 240 enhanced
vehicle inspection and maintenance program as a means of compliance with section 182 or 187 of
the Clean Air Act, but the [EPA] may approve such a program if a State chooses to adopt the
program as a means of compliance with such section." National Highway System Designation Act
of 1995, § 348 (P.L. 104-59, November 28, 1995).
6. S.B. 178 provided: "The Commission may not require in any non-attainment area an
emissions testing technology or procedure that is more stringent than a technology or procedure
used or in place . . . before January 1, 1994."
7. See City of Dallas v. Trammell, 101 S.W.2d 1009, 1013-15 (Tex. 1937) ("A right, to be
within the protection of the Constitution, must be a vested right. It must be something more than
a mere expectancy based upon an anticipated continuance of an existing law.") (citing Dodge v.
Board of Educ. of City of Chicago, 5 N.E.2d 84 (Ill. 1936)); see also National Carloading Corp.
v. Phoenix-El Paso Express, 176 S.W.2d 564, 569-70 (Tex. 1943) ("[P]laintiff does not possess
such a vested right as to come within the inhibition of the Fifth Amendment. Such a right must
be something more than a mere expectation based upon an anticipated continuance of the existing
law. It must have become a title, legal or equitable, to the present or future enjoyment of
property, or to present or future enforcement of a demand, or a legal exemption from the demand
of another.").
8. See Federal Sign v. Texas S. Univ., 951 S.W.2d 401, 408 (Tex. 1997).
9. We are mindful that the OCs cite Texas Parks & Wildlife Deptartment v. Callaway, 971
S.W.2d 145 (Tex. App.--Austin 1998, no pet.) for the proposition that contractual rights can be
the subject of a governmental taking under Texas law. We note, however, that Callaway
concerned an easement, and involved the State's affirmative actions which changed the character
of the waterway adjacent to Callaway's property from private to public. Thus, Callaway does not
support the proposition that mere contract rights are protected by the takings clause of the Texas
constitution. Moreover, easements, as opposed to the contracts at issue here, touch and concern
real property.
10. To recover under a takings claim, claimant must establish: (1) the State intentionally
performed certain acts; (2) which resulted in a "taking" of property; (3) for public use. Green
Int'l, Inc. v. State, 877 S.W.2d 428, 434 (Tex. App.--Austin 1994, writ dism'd).
11. The monies appropriated by S.B. 19 for the OCs during the moratorium imply that the
legislature's purposes were other than the avoidance of any financial obligation.
12. "Since abatement and control of air pollution through systematic and timely attainment of
the air quality standards is Congress' overriding objective, a plan, once adopted by a state and
approved by the EPA becomes controlling and must be carried out by the state." Friends of the
Earth v. Carey, 535 F.2d 165, 170 (2nd Cir. 1976).
13. The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States
which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any
Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art.
VI, cl. 2.
14. The OCs attempt to interpret Texas Health & Safety Code Ann. § 382.032 as a waiver by
the State of its immunity from suit in this case. See Tex. Health & Safety Code Ann. § 382.032
(West Supp. 1999). We disagree. Section 382.032 allows suit in a Travis County district court
by a person "affected by a ruling, order, decision or other act of the Board or of the Executive
Director." Id. This section, however, contemplates rulings of a regulatory nature, not of a
contractual nature.


/EM>Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 1997).
2. For convenience, we will refer to both the Texas Air Control Board and the TNRCC
collectively as the TNRCC.
3. Prior to 1990, Texas had a decentralized emissions testing program; any qualified auto
repair shop or gas station could perform emissions testing.
4. The relevant obligations of each OC under the terms of the Service Agreements were
identical. For convenience, we refer to the agreements collectively as the "Service Agreement."
5. Congress did relax emissions testing standards in November 1995: "The Administrator of
the [EPA] shall not require adoption or implementation by a State of a test-only I/M 240 enhanced
vehicle inspection and maintenance program as a means of compliance with section 182 or 187 of
the Clean Air Act, but the [EPA] may approve such a program if a State chooses to adopt the
program as a means of compliance with such section." National Highway System Designation Act
of 1995, § 348 (P.L. 104-59, November 28, 1995).
6. S.B. 178 provided: "The Commission may not require in any non-attainment area an
emissions testing technology or procedure that is more stringent than a technology or procedure
used or in place . . . before January 1, 1994."
7. See City of Dallas v. Trammell, 101 S.W.2d 1009, 1013-15 (Tex. 1937) ("A right, to be
within the protection of the Constitution, must be a vested right. It must be something more than
a mere expectancy based upon an anticipated continuance of an existing law.") (citing Dodge v.
Board of Educ. of City of Chicago, 5 N.E.2d 84 (Ill. 1936)); see also National Carloading Corp.
v. Phoenix-El Paso Express, 176 S.W.2d 564, 569-70 (Tex. 1943) ("[P]laintiff does not possess
such a vested right as to come within the inhibition of the Fifth Amendment. Such a right must
be something more than a mere expectation based upon an anticipated continuance of the existing
law. It must have become a title, legal or equitable, to the present or future enjoyment of
property, or to present or future enforcement of a demand, or a legal exemption from the demand
of another.").
8. See Federal Sign v. Texas S. Univ., 951 S.W.2d 401, 408 (Tex. 1997).
9. We are mindful that the OCs cite Texas Parks & Wildlife Deptartment v. Callaway, 971
S.W.2d 145 (Tex. App.--Austin 1998, no pet.) for the proposition that contractual rights can be
the subject of a governmental taking under Texas law. We note, however, that Callaway
concerned an easement, and involved the State's affirmative actions which changed the character
of the waterway adjacent to Callaway's property from private to public. Thus, Callaway does not
support the proposition that mere contract rights are protected by the takings clause of the Texas
constitution. Moreover, easements, as opposed to the contracts at issue here, touch and concern
real property.
10. To recover under a takings claim, claimant must establish: (1) the State intentionally
performed certain acts; (2) which resulted in a "taking" of property; (3) for public use. Green
Int'l, Inc. v. State, 877 S.W.2d 428, 434 (Tex. App.--Austin 1994, writ dism'd).
11. The monies appropriated by S.B. 19 for the OCs during the moratorium imply that the
legislature's purposes were other than the avoidance of any financial obligation.
12. "Since abatement and control of air pollution through systematic and timely attainment of
the air quality standards is Congress' overriding objective, a plan, once adopted by a state and
approved by the EPA becomes controlling and must be carried out by the state." Friends of the
Earth v. Carey, 535 F.2d 165, 170 (2nd Cir. 1976).
13. The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States
which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any
Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U